Erika Birch (ISB No. 7831)
Strindberg Scholnick Birch
    Hallam Harstad Thorne
American Civil Liberties Union of
    Idaho Foundation Cooperating Attorney
1516 W. Hays Street
Boise, Idaho 83702
Tel: (208) 336-1788
Erika@idahojobjustice.com

Samir Deger-Sen*
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
samir.deger-sen@lw.com

Scarlet Kim*
Andrew Beck*
Elizabeth Gyori*
American Civil Liberties Union
    Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
Fax: (212) 549-2649
scarletk@aclu.org
abeck@aclu.org
egyori@aclu.org

*Attorneys for Plaintiffs*
*\* Pro hac vice applications forthcoming*

*Additional attorneys listed on next page*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
### SOUTHERN DIVISION

| | |
|---|---|
| **IDAHO FEDERATION OF TEACHERS; UNIVERSITY OF IDAHO FACULTY FEDERATION, LOCAL 3215 OF THE AMERICAN FEDERATION OF TEACHERS; ALETA QUINN; CASEY JOHNSON; MARKIE MCBRAYER; ZACHARY TURPIN; KATHRYN BLEVINS;** and **HEATHER WITT,**<br><br>Plaintiffs,<br><br>v.<br><br>**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as Ada County Prosecuting Attorney; **STEPHEN F. HERZOG**, in his official capacity as Bannock County Prosecuting Attorney; and **BILL THOMPSON**, in his official capacity as Latah County Prosecuting Attorney,<br><br>Defendants. | Case No. 1:23-CV-353<br><br>**COMPLAINT** |

Danielle Conley*
Margaret A. Upshaw*
Cherish A. Drain*
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200
Fax: (202) 637-2201
danielle.conley@lw.com
maggie.upshaw@lw.com
cherish.drain@lw.com

Peter Trombly*†
Margaret Babad*
Emily True*
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
peter.trombly@lw.com
molly.babad@lw.com
emily.true@lw.com

Marissa Marandola*
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Tel: (617) 948-6000
Fax: (617) 948-6001
marissa.marandola@lw.com

Dina Flores-Brewer (ISB No. 6141)
American Civil Liberties Union of
    Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
DFloresBrewer@acluidaho.org

Amanda Barnett*
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: (213) 485-1234
Fax: (213) 891-8763
amanda.barnett@lw.com

Seth Kreimer*
3501 Sansom Street
Philadelphia, PA
skreimer@law.upenn.edu

*Attorneys for Plaintiffs*

* Pro hac vice applications forthcoming
† Admitted to practice in Virginia only

## COMPLAINT

Plaintiffs Idaho Federation of Teachers; University of Idaho Faculty Federation, Local 3215 of the American Federation of Teachers; Aleta Quinn; Casey Johnson; Markie McBrayer; Zachary Turpin; Kathryn Blevins; and Heather Witt, by and through their attorneys, bring this civil action for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1. Plaintiffs are university professors and unions with university faculty members who teach about abortion across a diverse array of disciplines. They file this suit to challenge Idaho's criminal prohibition on any speech by a public employee—including academic instruction, discussion, and research at Idaho's public universities—that expresses a viewpoint favorable to abortion.

2. The foundational purpose of our Nation's public universities is to foster the open and robust exchange of ideas on wide-ranging subjects of social, legal, and political importance. As the United States Supreme Court has recognized: "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). It is therefore imperative that professors "always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.* To facilitate such inquiry, and expose students, fellow academics, and the broader public to a variety of viewpoints, professors must be able to teach courses, moderate discussion, advise student research and writing, and publish scholarship without "a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

1

3.      In Idaho, the legislature has determined these ideals no longer apply to academic inquiry about abortion—one of today's most urgent social, moral, and political issues. Idaho's No Public Funds for Abortion Act ("NPFAA") prohibits the use of public funds to "promote abortion" or "counsel in favor of abortion"—bans that are simultaneously sweeping and unclear. Idaho Code § 18-8705(1). These prohibitions broadly apply to all recipients of public funds, including those, like public university professors, whose salaries are publicly funded and whose day-to-day work involves the use of publicly funded resources. By enacting the NPFAA, the Idaho legislature has placed a "strait jacket upon the intellectual leaders" of the State's public universities. *Sweezy*, 354 U.S. at 250. And that strait jacket is viewpoint discriminatory—for professors can engage in academic speech that opposes or counsels against abortion without risking prosecution. The NPFAA's vague terms have also generated uncertainty about the prohibition's scope, exacerbating the chilling effect on academic expression.

4.      Public employees who violate the NPFAA are subject to harsh criminal penalties for misusing public funds, including incarceration for up to fourteen years, fines, termination from public employment, and restitution of the "misused" public funds. Idaho Code § 18-5702. The NPFAA therefore leaves Idaho's public university educators with an impossible—and unconstitutional—choice: avoid any speech that could be construed as favorable to abortion in course materials, lectures, class discussions, student assignments, and academic scholarship; or risk imprisonment, loss of livelihood, and financial ruin for violating the law.

5.      The NPFAA has stifled free and open academic inquiry about abortion across Idaho's public universities. Professors who previously taught, discussed, or wrote about abortion no longer do so. A professor of philosophy, for example, has excised an entire module on human reproduction from her "Biomedical Ethics" course—removing reading assignments, including a

seminal work of applied ethics, and class discussion on a topic central to the study of bioethics—because she fears prosecution under the NPFAA. Other professors teaching across diverse disciplines—including history, literature, political science, sociology, journalism, and social work—have also significantly altered course content as a result of the NPFAA. In addition to pulling course modules and reading materials, professors have curtailed lectures and classroom discussion; stopped assigning, evaluating, and giving meaningful feedback on student research and writing; and refrained from pursuing certain scholarship or publicizing their academic work. The threat of prosecution continues to hang over professors as they plan for the upcoming school year, renewing their dilemma about how to structure their courses, teach their students, and pursue their own research in the face of the NPFAA. This fear of prosecution has forced these instructors to betray their own pedagogical objectives and scholarly interests.

6.      The NPFAA violates the First Amendment by banning academic speech that could be construed as supporting abortion at Idaho's public universities. The significant interests of professors in uttering such speech, and the interests of their students, fellow academics, and members of the public in hearing that speech, are not outweighed by any impact on the actual operation of the government. Nor can the government legitimately regulate *academic speech* about abortion in the name of advancing its regulation of abortion procedures themselves.

7.      The NPFAA also violates the Due Process Clause of the Fourteenth Amendment, which prohibits vague laws. It is difficult, if not impossible, for individuals to determine what is, and is not, prohibited by the statute because it is unclear where the NPFAA draws the line between permissible speech and speech that "promote[s]" or "counsel[s] in favor of" abortion. Idaho Code § 18-8705(1). The NPFAA not only fails to provide fair notice to speakers, but also confers

unbounded discretion on police and prosecutors to draw their own lines between permissible and prohibited speech, inviting arbitrary and discriminatory enforcement of the NPFAA's restrictions.

8.      Plaintiffs respectfully urge this Court to declare the NPFAA unconstitutional under the First and Fourteenth Amendments and to issue preliminary and permanent injunctive relief barring its enforcement.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, because this is an action to enforce constitutional rights pursuant to 42 U.S.C. § 1983 and the United States Constitution.

10.      This Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and 1343; Federal Rules of Civil Procedure 57 and 65; and the general legal and equitable powers of the court.

11.      Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the acts or omissions giving rise to this action arose from events occurring in this judicial district.

12.      Venue is proper in the Southern Division pursuant to D. Idaho Civ. R. 3.1 because two of the Defendants legally reside in Ada County, Idaho, and some of the acts or omissions giving rise to this action occurred in this division.

## PARTIES

I.      **Plaintiffs**

A.      **Union Plaintiffs**

13.      Plaintiff Idaho Federation of Teachers ("State Federation") sues on its own behalf and on behalf of its members. The State Federation is a state affiliate of the American Federation of Teachers ("AFT"), a national teachers' union. The State Federation comprises three local

4

federations of the AFT—the University of Idaho Faculty Federation, Local 3215; the Boise State University Federation of Teachers, Local 3537; and the Idaho State University Federation of Teachers, Local 2438—and the individual members of those local federations.

14.     Plaintiff University of Idaho Faculty Federation, Local 3215 of the AFT ("UI Federation") sues on its own behalf and on behalf of its members. The UI Federation is a local federation of the AFT and a member of the State Federation.

15.     Numerous members of the State Federation and the UI Federation (collectively, the "Union Plaintiffs") teach courses where abortion is an essential or relevant topic. They fear that their academic speech falls within the coverage of the NPFAA and may subject them to prosecution, and many of these members have altered their academic speech related to abortion to avoid or mitigate this risk of prosecution.

**B.     Professor Plaintiffs**

17.     Plaintiff Aleta Quinn is an Associate Professor of Philosophy at the University of Idaho.

18.     Plaintiff Casey Johnson is an Associate Professor of Philosophy at the University of Idaho.

19.     Plaintiff Markie McBrayer is an Assistant Professor of Political Science at the University of Idaho.

20.     Plaintiff Zachary Turpin is an Associate Professor of American Literature at the University of Idaho.

21.     Plaintiff Kathryn Blevins is an Associate Professor of Journalism and Mass Media and Co-Director of the Women's, Gender, and Sexuality Studies Program at the University of Idaho.

22.     Plaintiff Heather Witt is an Associate Professor of Social Work and Coordinator of the Bachelor of Social Work Program at Boise State University and a member of the State Federation.

23.     As set forth in greater detail below, Professors Quinn, Johnson, McBrayer, Turpin, Blevins, and Witt (collectively, the "Professor Plaintiffs") teach courses where abortion is an essential or relevant topic. They fear that their academic speech falls within the coverage of the NPFAA and may subject them to prosecution, and have altered their academic speech related to abortion to avoid or mitigate this risk of prosecution.

## II.     Defendants

24.     Defendant Raúl Labrador is the Attorney General of the State of Idaho, named in his official capacity. The Idaho Attorney General legally resides in Ada County, Idaho, and is a proper defendant in a case challenging the enforcement of an Idaho criminal statute in any county in the state. Idaho Code §§ 67-802(7), 67-1401(7); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004); *Almerico v. Denney*, 532 F. Supp. 3d 993, 1001 (D. Idaho 2021).

25.     Defendant Jan M. Bennetts is the Ada County Prosecuting Attorney, named in her official capacity. Defendant Bennetts is a proper defendant because she bears primary responsibility for enforcing the NPFAA, Idaho Code § 18-8709 and § 18-5702, in Ada County, where Boise State University is located, *see id.* §§ 31-2227(1), 31-2604(1)-(2).

26.     Defendant Stephen F. Herzog is the Bannock County Prosecuting Attorney, named in his official capacity. Defendant Herzog is a proper defendant because he bears primary responsibility for enforcing the NPFAA, *id.* § 18-8709 and § 18-5702, in Bannock County, where Idaho State University is located, *see id.* §§ 31-2227(1), 31-2604(1)-(2).

6

27.     Defendant Bill Thompson is the Latah County Prosecuting Attorney, named in his official capacity. Defendant Thompson is a proper defendant because he bears primary responsibility for enforcing the NPFAA, *id.* § 18-8709 and § 18-5702, in Latah County, where the University of Idaho is located, *see id.* §§ 31-2227(1), 31-2604(1)-(2).

## FACTUAL ALLEGATIONS

### I.     The No Public Funds for Abortion Act

#### A.     Statutory Text

28.     On May 3, 2021, the Idaho legislature passed the No Public Funds for Abortion Act. Idaho Code §§ 18-8701–11; 2021 Idaho Sess. Laws 1015-18 (H.B. No. 220). Idaho Governor Brad Little signed the NPFAA into law on May 10, 2021 and it went into effect that same day. *See id.* at 1018.

29.     The NPFAA created a new Chapter 87, contained in Title 18 of the Idaho Code, which covers "Crimes and Punishments."

30.     Section 18-8705 of the NPFAA is entitled "Use of Public Funds for Abortion Prohibited." Section 18-8705(1) of the NPFAA provides:

> No public funds made available by the state, a county, a city, a public health district, or any local political subdivision or agency thereof and distributed by any institution, board, commission, department, agency, official, or employee of the state, a county, a city, a public health district, a public school district, or any local political subdivision or agency thereof shall be used in any way to provide, perform, or induce an abortion; assist in the provision or performance of an abortion; *promote abortion*; *counsel in favor of abortion*; refer for abortion; or provide facilities for an abortion or for training to provide or perform an abortion.

Idaho Code § 18-8705(1) (emphasis added).

31.     Section 18-8705(2) of the NPFAA provides:

> No person, agency, organization, or any other party that receives funds authorized by the state, a county, a city, a public health district, a public school district, or any local political subdivision or agency thereof may use those funds to perform or *promote abortion*, provide counseling in favor of abortion, make referral for

abortion, or provide facilities for abortion or for training to provide or perform abortion.

Idaho Code § 18-8705(2) (emphasis added).

32.     Section 18-8702 defines various terms contained in the NPFAA. The section defines "public funds" as "the funds of every political subdivision of the state wherein taxes are levied or fees are collected for any purpose." *Id.* § 18-8702(5). It also includes within the definition of "public funds," "[t]he revenue or money of a government, state, or municipal corporation" and "[g]overnment spending for acquisition of goods and services for current use to directly satisfy individual or collective needs of the members of the community." *Id.* § 18-8702(5)(a), (c).

33.     The NPFAA does not define the terms "promote" or "counsel in favor of" anywhere in the statute. *See id.* §§ 18-8701–11.

34.     Violating the NPFAA is a crime. The NPFAA provides that "[a]ny intentional violation of the provisions of this chapter by a public officer or public employee shall be considered a misuse of public moneys punishable under section 18-5702, Idaho Code." *Id.* § 18-8709.

35.     Under section 18-5702, any public employee not charged with receiving, safekeeping, or disbursing public moneys, who misuses less than $300 of public moneys, is guilty of a misdemeanor offense, punishable by a fine of up to $1,000, a term of imprisonment of up to one year, or both. *Id.* § 18-5702(1). Any public employee charged with receiving, safekeeping, or disbursing public moneys, who misuses less than $300 of public moneys, is guilty of a felony offense, punishable by a fine of up to $5,000, a term of imprisonment of up to five years, or both. *Id.* § 18-5702(2). Any public employee who misuses more than $300 of public moneys is guilty of a felony offense, punishable by a fine of up to $10,000, a term of imprisonment of at least one year and up to fourteen years, or both. *Id.* § 18-5702(3).

36.     Upon information and belief, professors—whose salaries are paid through public funds and who routinely use publicly funded resources in their teaching and scholarship—would be subject to section 18-5702(3)'s felony penalties for any violation of the NPFAA.

37.     A public employee who is convicted of misusing public moneys in violation of the NPFAA shall also "[b]e terminated for cause from the public office or employment" and be required to "[m]ake restitution of any public moneys misused." *Id.* § 18-5702(5)(a), (b). A public employee convicted of violating the NPFAA shall also, subject to certain exceptions, "be disqualified from holding any position as a public officer or public employee if such position is charged with the receipt, safekeeping or disbursement of public moneys." *Id.* § 18-5702(5)(c). Such public employee may also, "[i]n the discretion of the court, and unless otherwise prohibited by law, be ordered to apply for distribution of any retirement moneys held by any entity on behalf of the person, in order that such moneys shall be used to make restitution to the public entity or its insurer, unless other funds are otherwise available." *Id.* § 18-5702(5)(d).

**B.     University Guidance Regarding the NPFAA**

38.     In June 2022, a little more than a year after Idaho passed the NPFAA, the Supreme Court released its decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *Dobbs* addressed the "question whether all pre-viability prohibitions on elective abortions are unconstitutional," *id.* at 2244 (citation omitted), answering the question in the negative and overruling *Roe v. Wade*, 401 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

39.     *Dobbs* radically altered the landscape of laws governing abortion across the country. For decades, federal constitutional protection for the right to obtain an abortion prevented states from enforcing many laws criminalizing abortion. The disappearance of that constitutional

protection created widespread uncertainty about the legal regimes governing abortion from state to state.

40.     In Idaho, *Dobbs* "triggered" the state's criminal ban on abortion ("Total Abortion Ban"), which was set to become effective following any Supreme Court ruling removing federal constitutional protection for the right to obtain an abortion. *See Planned Parenthood Great Northwest v. State*, 522 P.3d 1132, 1152 (Idaho 2023). Idaho's Total Abortion Ban prohibits performing or attempting to perform an abortion, with only a narrow affirmative defense for abortions "necessary to prevent the death of the pregnant woman" or where "the woman has reported [an] act of rape or incest" to the authorities. Idaho Code § 18-622.

41.     The massive change in the legal landscape governing abortion and resulting uncertainty in the aftermath of *Dobbs* led Idaho's public universities and their employees to re-examine Idaho law's restrictions related to abortion. In doing so, they focused in particular on the implications of the NPFAA, including for academic speech. During the Fall 2022 semester, several of Idaho's public universities issued "guidance" to their employees regarding the NPFAA and what university faculty must do to comply with the law. This "guidance" only underscored the substantial uncertainty surrounding the scope of the NPFAA's prohibitions and the risk of criminal punishment for a wide swath of abortion-related academic speech.

### 1.     University of Idaho

42.     On September 23, 2022, the General Counsel of the University of Idaho issued a memorandum to all University of Idaho employees ("UI Memorandum") regarding the NPFAA. The Executive Summary of the UI Memorandum instructs that "[d]uring all times that university employees are performing their jobs," the NPFAA "prohibits them" from "using or providing institution funds or facilities" for "[p]romoting abortion" or "[c]ounseling in favor of abortion." It

further states that "[i]ndividuals convicted of violating" the NPFAA may face "[m]isdemeanor or felony convictions (with imprisonment and fines); [m]andatory reimbursement of funds used in violation of the law;" and "[m]andatory loss of state employment." The Executive Summary concludes that "[i]n this new and evolving legal landscape, how the[ ] [NPFAA] will be enforced remains unclear" and that "the university and its employees should be aware of the potential risks and penalties associated with conduct that may be perceived to violate the law[ ]."

43.    The UI Memorandum proceeds to offer "recommendations for compliance in the context of university operations." With respect to "classroom discussion," the UI Memorandum advises that the NPFAA "remain[s] applicable" and that, "[w]hile academic freedom supports classroom discussions of topics related to abortion," it is also "not a defense to violation of law." The memorandum thus cautions that classroom discussion on abortion "should be approached carefully," and that University of Idaho employees must "remain neutral on the topic and cannot conduct or engage in discussions in violation of these prohibitions without risking prosecution."

44.    With respect to "[c]ounseling or interacting with students," the UI Memorandum advises University of Idaho employees to "proceed cautiously at any time that a discussion moves into the direction of reproductive health, including abortion," and that "[i]f a discussion moves into this area, students should be clearly informed that Idaho law prohibits the university and its employees from counseling in favor of abortion, referring for abortion or promoting abortion."

45.    With respect to "[d]irecting students to sources of information outside of the university," the UI Memorandum advises that it "is permitted if done properly and with neutrality." The UI Memorandum goes on to explain that students must be directed to sources "where students can receive a discussion of *all* aspects of the topic," and that University of Idaho employees must

"simply reference the ability of the outside sources to have a broader discussion of all aspects of the topic."

46.    On October 5, 2022, the University of Idaho's President and Provost sent a "[c]larifying" e-mail to all "University of Idaho Students and Employees" ("UI E-mail"). The UI E-mail states that "[t]he Idaho laws, brought to the forefront by the overturn of Roe v. Wade, are indeed complex, unclear and written to be punitive for state employees" and that the University "cannot make any guarantees about how the state will choose to enforce them." The UI E-mail explains that the University did not change its academic freedom policies and that "[t]he university does not impose criminal charges nor conduct criminal investigations," but notes that "[p]enalties of the law are criminal in nature." The UI E-mail concludes by stating that "[m]ore nuanced guidance in the form of a FAQ is being developed to help you understand our state's law."

47.    Following the UI E-mail, in or about October 2022, the University of Idaho issued the promised FAQ, entitled "Frequently Asked Questions—Guidance for University Employees and Community Regarding State Laws on Abortion and Contraceptives" ("UI FAQ"). In response to the question, "Can I teach or talk about abortion in my class?," the UI FAQ states that "[t]he university encourages faculty to engage in educational discussions on topics of their choice" and "does not intend to create a chilling effect on academic freedom or first amendment rights." However, it goes on to caution that the NPFAA "applies criminal penalties to individuals" and "is vague in many respects which creates uncertainty as to the extent of the law." The UI FAQ concludes by stating that "each individual employee . . . can choose to assess for themselves what level of risk they are comfortable with when determining what they teach or talk about in performing their job."

48.     Like the UI Memorandum, the UI FAQ reminds employees, in response to a question about the penalties for violating the NPFAA, that the statute "calls for, depending on the circumstances, misdemeanor or felony penalties" and that "[i]f an employee is found guilty under [the NPFAA], the law also requires termination of employment, restitution, and disqualification from certain public employment."

49.     In response to the question, "How does the NPFAA affect faculty research?," the UI FAQ responds: "Guidance will be issued on this shortly." Upon information and belief, the University of Idaho has not issued any further guidance addressing the NPFAA's application to academic research.

*2.     Boise State University*

50.     In or about September 2022, Boise State University issued a document entitled "Frequently Asked Questions: No Public Funds for Abortion Act and Idaho Abortion Laws" ("BSU FAQ").

51.     In response to the question, "Can curriculum include information or training regarding abortion . . . ?," the BSU FAQ states that, "[b]ased on the plain language of the NPFAA, curriculum and training could include general information and educational materials that discuss abortion," but only "so long as it does not engage in prohibited activity in so doing." It then offered, as an example, that "the material should not promote abortion."

52.     Like the UI Memorandum, the BSU FAQ warns employees that violations of the NPFAA can result in criminal liability and punishment, including fines, imprisonment, termination of employment, restitution, and disqualification from certain public employment.

3.     *Idaho State University*

53.     Idaho State University has not provided generally applicable written guidance to faculty members regarding compliance with the NPFAA.

54.     In response to requests for guidance from individual faculty members, the Idaho State University General Counsel has advised certain faculty members to be cautious when teaching, researching, or writing in areas within the NPFAA's ambit. The General Counsel has also encouraged certain faculty members to limit class discussion about abortion to factual information, without touching on policy debates or opinions that could be construed as promoting abortion, and to refrain from providing any materials that could be viewed as promoting or taking a position in support of abortion. The General Counsel has advised certain faculty members that because the NPFAA is an untested law, the risk of criminal liability for faculty is high.

**C.     County Prosecuting Attorneys' Silence on the NPFAA**

55.     In November 2022, the American Civil Liberties Union of Idaho wrote letters to the County Prosecuting Attorneys for Ada, Bannock, and Latah Counties regarding the NPFAA. Those letters described the uncertainty surrounding the law's interpretation, fears of criminal prosecution among faculty members at Idaho's public universities, and the resulting chilling effect on academic speech. The letters asked the Ada, Bannock, and Latah County Prosecuting Attorneys to provide "assurances that [they] will not pursue prosecutions against university faculty" for teaching, scholarship, and public speech that "presents ideas that favor or promote abortion."

56.     As of the filing of this action, no County Prosecuting Attorney has responded to these letters.

**D.     The Idaho Legislature's Decision Not to Amend the NPFAA**

57.     On January 11, 2023, Representative Bruce Skaug presented H.B. 2 to the Idaho House of Representative's State Affairs Committee. In relevant part, H.B. 2 proposed an

amendment to the NPFAA to define the term "promote" as it appears in sections 18-8705(1) and (2) by adding the following sentence to the end of each section: "As used in this subsection, the term 'promote' shall not be interpreted as preventing any classroom discussion on the subject of abortion at a school, college, or university." H.B. 2, § 6, 67th Leg., First Reg. Sess. (Idaho 2023).

58.    On January 18, 2023, H.B. 2 was reported out of the State Affairs Committee, but the bill was returned to the committee on January 27, 2023. No further action was taken on the bill before the end of the 2023 Legislative Session in April 2023. The NPFAA therefore remains in effect in its original form and does not include any exception for classroom discussion on abortion, or any other academic speech.

## II.    The NPFAA Has Chilled Academic Speech at Idaho's Public Universities

59.    Universities play an essential role in the preservation of democratic institutions and ideals. For that reason, the Supreme Court has recognized that "academic freedom . . . is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603. In order for academic freedom to thrive, university classrooms and campuses must be vibrant "'marketplace[s] of ideas,'" cultivating the "robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Id.* (citation omitted).

60.    Abortion is a topic that implicates legal, social, political, and moral principles and values. Abortion is therefore a critical topic of study, discussion, and scholarship across numerous academic fields. Professor Plaintiffs and faculty members of the Union Plaintiffs have taught, discussed, and written about abortion in varied disciplines, including philosophy, history, literature, political science, sociology, journalism, and social work.

61.     In the wake of *Dobbs*, abortion continues to be a pressing national issue, igniting fierce debate across the country and prompting divergent legislative and policy approaches. Accordingly, educators and students remain keen to inquire about, study, and debate abortion.

62.     The NPFAA, however, skews and suppresses academic inquiry and discussion about abortion at Idaho's public universities. Under the statute, faculty members cannot engage in academic speech that includes viewpoints "promot[ing]" or "counsel[ing] in favor of" abortion. Idaho Code § 18-8705(1). Due to this speech restriction, as well as the lack of clarity about the NPFAA's scope, many faculty members have been forced to refrain from engaging in a wide range of academic expression related to abortion. And other faculty members who have not altered their academic speech fear prosecution under the NPFAA because their teaching or scholarship continues to include viewpoints that may be construed as promoting or counseling in favor of abortion. The examples below illustrate, but do not exhaustively describe, how academic speech touching on abortion has ceased, or has been drastically limited, across many different departments at Idaho's public universities. The NPFAA's chilling effect will continue in the upcoming school year, as professors plan their courses, assign reading materials, lecture, moderate class discussion, advise student research and writing, and consider whether to pursue or promote their research.

### A.     Course Materials and Classroom Discussion

63.     Due to the NPFAA's restrictions on the use of public funds to "promote" or "counsel in favor of" abortion, Idaho Code § 18-8705(1), professors at Idaho's public universities have made significant changes to their course content, preventing them from presenting important information relevant to their disciplines and hindering students' ability to gain a comprehensive, nuanced understanding of those disciplines. Some professors have stripped entire modules that address abortion out of their courses; others have removed assigned reading materials addressing

abortion. They have also curtailed or restructured their approach to classroom discussion, including by silencing themselves, in order to eliminate, or at least limit, discussion of abortion.

### 1.   *Professor Plaintiffs*

64.   Because of the NPFAA, Professor Quinn substantially altered her "Professional Ethics: Biomedical Ethics" course, which addresses ethical, social, and legal issues that arise in medicine and biomedical research, during the Spring 2023 semester. Prior to the NPFAA, Professor Quinn included a module on human reproduction in her course, which covered the history of abortion, conceptions of personhood, statistics regarding abortion, and philosophical arguments about abortion and human reproduction. Abortion is a core issue in the field of bioethics both on its own terms and because it provides an important backdrop to foundational ethical theories, including the principles of autonomy and "do no harm." The module assigned readings that covered various philosophical perspectives in favor of and opposing abortion, including a chapter in the textbook *Bioethics in Context*[1] on "Issues in Human Reproduction," and the articles "An Argument that Abortion Is Wrong" by Don Marquis[2] and "A Defense of Abortion" by Judith Jarvis Thomson.[3] Professor Quinn would also lead discussion on these materials as part of the human reproduction module.

65.   During the Spring 2023 semester, Professor Quinn removed the module on human reproduction from her course because she feared that the inclusion of positive viewpoints about abortion access in assigned reading and classroom discussion could be viewed as promoting or

---

[1] Gary E. Jones & Joseph P. DeMarco, *Bioethics in Context*: *Moral Legal, and Social Perspectives* (2016).

[2] Don Marquis, *An Argument that Abortion is Wrong* in *Ethics in Practice: An Anthology* 149 (Hugh LaFollette ed., 5th ed. 2020).

[3] Judith Jarvis Thomson, *A Defense of Abortion*, 1 Phil. & Pub. Affs. 47 (1971), https://spot.colorado.edu/~heathwoo/Phil160,Fall02/thomson.htm.

counseling in favor of abortion under the NPFAA. Professor Quinn felt it was not possible to teach only negative viewpoints on abortion, a nuanced and complex philosophical issue, because it was arguably unethical and did a disservice to her students. Professor Quinn also avoided discussing abortion in connection with other issues such as genetic testing, even though it is highly relevant or even integral to the other bioethical subjects she teaches. And while Professor Quinn previously permitted students to choose a topic to cover during the final weeks of her course, Professor Quinn no longer permits students to choose a topic to avoid the possibility of having to teach on abortion-related issues, which students have previously chosen. As long as the NPFAA applies to her academic speech, Professor Quinn will not teach abortion-related materials or facilitate classroom discussion about abortion as part of her "Biomedical Ethics" course. Professor Quinn believes these changes have seriously inhibited her ability to effectively teach in her area of expertise, and have deprived her students of the comprehensive, nuanced education they deserve.

66.     Professor Johnson has significantly changed her "Introduction to Ethics" and "Honors Ethics" courses, which examine traditional ethical theories and apply them to contemporary moral issues, to avoid the risk of prosecution under the NPFAA. Before the NPFAA's passage, Professor Johnson gave students the option to choose reproductive rights as a module in both courses, which they frequently did. When students chose reproductive rights as a module, Professor Johnson would cover basic facts about abortion, the legal landscape of abortion in the United States and Idaho, and different perspectives on reproductive healthcare and abortion. She would also assign two articles that presented competing perspectives, such as *A Defense of Abortion* by Judith Jarvis Thomson[4] and *Why Abortion is Immoral* by Don Marquis.[5] As Professor

---

[4] *See supra* n.3.

[5] Don Marquis, *Why Abortion is Immoral*, 86 J. Phil. 183 (1989), https://www.jstor.org/stable/i33 5804.

Johnson and other ethics scholars recognize, Thomson's article, which presents an ethical defense of abortion, is a particularly excellent teaching tool for ethics students, because it is one of the most significant works of applied ethics ever published. Professor Johnson would also facilitate classroom discussion on abortion, encouraging students to engage with the assigned materials by sharing their views, reactions, and analysis, and occasionally intervening to challenge weak arguments presented against or in favor of abortion and to ensure a diversity of viewpoints.

67.     Because she fears that assigning materials and moderating classroom discussion in the reproductive rights module may constitute promoting or counseling in favor of abortion under the NPFAA, Professor Johnson removed the option for students to choose reproductive rights as a module in both courses during the Fall 2022 semester. Professor Johnson also avoided discussing abortion throughout both courses, including by not drawing connections between abortion and ethical issues that arise in other contexts, such as euthanasia, for fear of violating the NPFAA, even though identifying overarching themes and principles across different issues is a core component of her ethics courses. So long as the NPFAA applies to her academic speech, Professor Johnson feels that she can no longer teach on a topic she has researched and lectured on for years; as a result, her students have been and will be deprived of the opportunity to learn about an important philosophical topic.

68.     Professor McBrayer has altered her classroom lectures and discussion in two of her political science courses due to the NPFAA. In the Fall 2022 semester, Professor McBrayer's students selected abortion as a topic for a class in her "Politics, Policy, and Gender" course, which examines women's participation in the political process. She prepared a lecture about abortion policy that would present state-by-state public opinions as they relate to abortion and discuss the disjuncture between public opinion and abortion policy in states that restrict abortion. But after re-

examining the NPFAA and the University of Idaho's guidance, Professor McBrayer determined that she could no longer lecture or moderate classroom discussion on abortion, due to the risk of prosecution under the NPFAA, and required her students to select a different topic. Professor McBrayer also plans to avoid speaking about abortion during class discussion in her "American Politics and Policy" course, which introduces students to U.S. public policy and policymaking. In the past, the course organically prompted discussions about abortion due to its salience in American politics. So long as the NPFAA applies to her academic speech, Professor McBrayer believes she cannot fully perform her role as an educator, which requires presenting students with a full array of political and policy viewpoints, including on the topic of abortion.

69.     Professor Turpin has changed his approach to classroom discussion in his "Introduction to Literary Genres" and "Introduction to English Studies" courses because of the NPFAA. In both courses, Professor Turpin assigns Sallie Tisdale's "We Do Abortions Here: A Nurse's Story,"[6] a well-regarded essay from the perspective of a nurse at an abortion clinic, which explores the nurse's mixed emotions in providing abortions, her perceptions of her patients seeking abortions, and the ethical dilemmas she faces as an abortion provider. A major goal of both courses is to encourage students to think beyond an either-or framing when considering a contentious issue. Professor Turpin teaches students to instead approach such issues through a dialectical framework that considers and incorporates multiple viewpoints in order to encourage a new, more nuanced understanding of the issue. Professor Turpin assigns Tisdale's essay because it addresses a controversial issue in a nuanced way and is a uniquely effective tool for teaching dialectical thinking and various rhetorical techniques.

---

[6] Sallie Tisdale, *We Do Abortions Here: A Nurse's Story*, Harper's Mag., Oct. 1987, at 66–70, https://archive.harpers.org/1987/10/pdf/HarpersMagazine-1987-10-0023201.pdf.

70.     Although Professor Turpin decided to assign Tisdale's essay during the Spring 2023 semester, notwithstanding the risk that the essay could be viewed as promoting or counseling in favor of abortion under the NPFAA, the NPFAA affected his approach to student engagement with the essay in class. To encourage dialectical thinking, Professor Turpin holds several structured classroom debates in his introductory courses by randomly assigning students to one of two positions, having them debate a question, and then asking them to reflect on the difference between binary debate and voicing their own, typically more nuanced, opinions. During these debates, Professor Turpin also acts as a moderator, interjecting to raise new points or challenge arguments if the conversation stalls or becomes one-sided. Professor Turpin was unwilling to have his students conduct a structured debate on Tisdale's essay because he feared that requiring students to speak "for" abortion and moderating the debate could be construed as violating the NPFAA. Professor Turpin believes that the structured debate is a more effective exercise to help students engage with the assigned material and improve their critical thinking skills. However, as long as the NPFAA applies to his academic speech, Professor Turpin will continue to forgo a structured debate on Tisdale's essay in his introductory courses.

71.     Professor Blevins has altered her approach to teaching and class discussion in her media studies courses in light of the NPFAA. In her "Women in the Media" course, Professor Blevins assigns articles discussing abortion as part of the course's examination of the history of feminist theory, including the *Vox* article, "The Waves of Feminism, and Why People Keep Fighting Over Them, Explained" by Constance Grady,[7] and an academic essay entitled, "Feminist

---

[7] Constance Grady, *The Waves of Feminism, and Why People Keep Fighting Over Them, Explained*, Vox (July 20, 2018), https://www.vox.com/2018/3/20/16955588/feminism-waves-explained-first-second-third-fourth.

Thought in Transition: Never a Dull Moment" by Rosemarie Tong.[8] In her "Law of Mass Media" course, Professor Blevins summarizes the Supreme Court's opinion in *Dobbs* in class and assigns commentary criticizing *Dobbs* as part of the course's examination of the judiciary and the Supreme Court's power to interpret the Constitution.[9]

72.    Professor Blevins has de-emphasized abortion as an aspect of feminist theory during class discussion in her "Women in the Media" course, out of fear that her discussion of abortion, including the theory that abortion is integral to women's liberation, constitutes promoting or counseling in favor of abortion in violation of the NPFAA. For similar reasons, Professor Blevins has limited classroom discussion of *Dobbs* and related commentary in her "Law of Mass Media" course, including by omitting discussion of the relationship between public opinion and the Court's abortion jurisprudence. In both courses, Professor Blevins has also provided disclaimers, informing her students that she cannot provide her opinion or viewpoint on abortion.

73.    Professor Blevins has also deviated from teaching her courses according to her preferred pedagogy due to the NPFAA. For example, Professor Blevins runs her "Women in the Media" class according to established feminist pedagogical principles by, *inter alia*, acknowledging her own biases and sharing her personal views when asked. However, she no longer feels comfortable doing so where the topic involves abortion. Professor Blevins believes that the way she has censored her own speech and curtailed classroom discussion in both courses has negatively impacted her students' engagement with the ideas and theories she teaches.

---

[8] Rosemarie Tong, *Feminist Thought in Transition: Never a Dull Moment*, 44 Soc. Sci. J., no. 1, 2007, at 23.

[9] Dahlia Lithwick, *How the Supreme Court Has Denigrated Its Own Legitimacy*, Slate (July 12, 2022), https://slate.com/news-and-politics/2022/07/supreme-court-dobbs-end-of-term-bruen-guns-abortion-prayer-tiered-rights.html.

However, as long as the NPFAA applies to her academic speech, Professor Blevins will maintain these changes when teaching these courses.

74.     Professor Witt has changed the course content in her "Human Sexuality for Helping Professionals" course and the "Human Sexuality in Social Work" course she coordinates. Before the NPFAA, Professor Witt assigned students in both courses a book chapter that she co-authored, which discusses international professional guidelines for social work that underlie the rationale for the pro-choice argument, in a module on reproductive justice and abortion.[10] But to avoid violating the NPFAA's proscription against promoting or counseling in favor of abortion, Professor Witt has removed this assignment from both courses and replaced it with material that covers only the application of social work principles in the United States. Professor Witt believes that this substitution has negatively impacted the course because social work accreditation requires a focus on the international application and impact of social work principles. However, as long as the NPFAA applies to her academic speech, Professor Witt will refrain from assigning her book chapter in these courses to avoid the risk of prosecution under the NPFAA.

75.     The Professor Plaintiffs represent just a fraction of the faculty members who fear prosecution due to the NPFAA's restrictions. For example, in her capacity as Co-Director of the University of Idaho's Women's, Gender, and Sexuality Studies program, Professor Blevins has spoken with faculty affiliated with the program about the NPFAA and its impact on their curriculum choices and classroom speech, and many of those faculty members have expressed their fear of criminal prosecution.

---

[10] Heather Witt et al., *Self-Determination and Abortion Access: A Pro-Choice Perspective on the International Statement of Ethical Principles*, in *The Routledge Handbook on Social Work Ethics and Values* 101 (Stephen Marson & Jr. McKinney eds., 2019).

2.    *Members of the Union Plaintiffs*

76.    Members of the UI Federation have also altered or are considering changes to their course content and classroom discussion because they fear prosecution for violating the NPFAA. For example:

- A professor whose course previously featured a unit on abortion and reproductive rights plans to remove the unit when they next teach the course. In the unit, the professor compared abortion policies in different countries, and assigned reading and facilitated class discussion on abortion, including on statistical studies showing that legal abortion can lead to a decrease in maternal mortality rates. This professor fears that such reading and discussion could be construed as promoting or counseling in favor of abortion under the NPFAA.

- A professor who teaches a sociology course on gender previously included a unit on the history of reproductive rights, which assigned readings and involved class discussion about the history of abortion restrictions, pro-choice organizations, and abortion access. Because of the NPFAA, this professor fears that assigning this abortion-related material and related class discussion places them at risk of prosecution. They have therefore removed this unit from their course.

- A professor who teaches American history will likely remove abortion-related materials from multiple courses. For example, in a course about 20th century American history, this professor previously assigned materials on the role the abortion debate and the Supreme Court's decision in *Roe v. Wade* played in the radical political, social, and cultural changes that occurred during and after the 1960s. But because these materials and related class discussion involve the

24

expression of pro-abortion viewpoints, this professor fears that continuing to include them in their courses places them at risk of prosecution under the NPFAA.

- A professor who teaches sociology courses that address the interaction between the institutions of law and gender has changed their approach to classroom discussion. In those courses, this professor previously discussed the Supreme Court's abortion cases and highlighted how the lack of access to legal abortion could negatively impact women's lives. But because this professor fears that they could be subject to prosecution for discussing any benefits of abortion access or disadvantages of lack of access, they have stopped discussing the impact of the Supreme Court's abortion cases and no longer teach other abortion-related topics they previously included in their courses.

- A professor who teaches ancient history has altered their approach to class discussion in two courses and is considering excising course content in another. In two of their courses, this professor has assigned readings on the use of abortifacients in the ancient world. Because this professor is concerned that facilitating class discussion of these materials could be perceived as expressing a viewpoint favorable to abortion, they no longer directly raise or discuss the materials and their implications. In a third course, this professor is considering entirely excising materials and class discussion about abortifacients due to similar concerns.

77.    Members of the State Federation likewise fear that they will be prosecuted under the NPFAA for teaching about abortion in their courses, and some have consequently altered their course content and approach to classroom discussion. For example:

- A professor who teaches a gender studies course previously included a unit on reproductive rights and assigned materials on different perspectives on abortion, which they used as a basis for class discussion. This professor now refrains from assigning those materials due to their fear of prosecution under the NPFAA. This professor has also cautioned guest speakers not to take a position on the merits of any particular abortion policy, and prevented students from presenting abortion-related resources.

- A lecturer whose courses address the sociology of sex, gender, family, and religion fears prosecution for assigning materials, lecturing, and facilitating class discussion about abortion in several courses. Their fear of prosecution for teaching about abortion has caused this professor to experience anxiety and forced them to monitor their classroom speech in an attempt to mitigate their risk under the NPFAA.

- A professor who teaches a course on human sexuality considered adding information about abortion-related resources and organizations to their course materials following *Dobbs*. Due to concern about the NPFAA's application to these materials, this professor sought advice from their university's general counsel, who advised this professor and others in their department to limit class discussion about abortion to factual information, without touching on policy debates or opinions that could be construed as promoting or taking a position in support of abortion, and to refrain from providing any materials that could be viewed similarly. This professor refrained from sharing the abortion-related materials out of concern that doing so would violate the NPFAA. For similar reasons, this professor did not include a discussion prompt about abortion when they last taught their course.

- A professor whose courses address the intersection between gender and literature assigns materials about the development of feminist thought, which has long engaged with abortion and reproductive rights. Because they fear that discussing feminist thought on abortion could lead to the expression of viewpoints favorable to abortion and subject them to prosecution, this professor monitors their speech carefully to avoid any suggestion they are promoting or counseling in favor of abortion. This professor has also censored their in-class speech about the NPFAA to avoid facilitating discussion that expresses viewpoints favorable to abortion.

- A professor of political science teaches a course with a unit on law and reproductive rights, which includes reading materials and class discussion on the legal history of abortion that they believe could be construed as promoting or counseling in favor of abortion in violation of the NPFAA. This professor fears prosecution under the NPFAA for assigning these materials and facilitating related class discussion. Following *Dobbs*, this professor and other faculty members planned to speak on a panel at the university about the legal and political implications of the case. Due to concerns that the event might violate the NPFAA, this professor sought advice from their university's general counsel, who responded that while the NPFAA did not prohibit open discussion on abortion, it prohibited public employees from using public funds to promote or counsel in favor of abortion. After discussion, the other faculty panelists decided to cancel the event rather than risk prosecution under the NPFAA.

B.        **Student Research and Writing Assignments**

78.      Due to the NPFAA, professors at Idaho's public universities have also made significant changes to how they approach student research and writing assignments in their courses. Some professors have completely eliminated abortion as a potential research topic for their students to pursue. Others have eliminated their guidance on external resources or severely pared back their feedback on student assignments that address abortion. In some cases, professors have also declined to substantively grade student work related to abortion.

79.      Prior to the NPFAA, in her "Biomedical Ethics" class, Professor Quinn provided prompts for research papers that related to abortion, and some students previously responded to those prompts. In the Spring 2023 semester, Professor Quinn removed abortion-related prompts out of concern that positively grading papers that take a pro-abortion stance or negatively grading papers that take an anti-abortion stance could be construed as promoting or counseling in favor of abortion under the NPFAA, rather than as academic decisions about the quality of a student's work.

80.      Professor Johnson has substantially altered her guidance and feedback on student research and presentation assignments in her "Honors Ethics" course. Before the NPFAA, students regularly picked abortion as a presentation or paper topic, and Professor Johnson would recommend external resources such as books, websites, and media to guide their research. When grading their papers, Professor Johnson would also provide detailed written and in-person feedback. But Professor Johnson fears that recommending certain external resources about abortion may qualify as promoting or counseling in favor of abortion under the NPFAA. She also worries that substantive feedback on students' presentations and papers may appear to favor one side of the abortion debate over another. As a result, Professor Johnson no longer recommends external resources or provides substantive feedback to students who choose to present or write

28

about abortion, even though she views giving such guidance and feedback as pedagogically important for students.

81.     Professor McBrayer has significantly altered her guidance to students completing research and presentation assignments on abortion in her upper-level "Politics, Policy, and Gender" course in light of the NPFAA. As part of that assignment, students develop and submit a literature review, and Professor McBrayer typically advises students on a range of academic and policy sources to include in their review, which approach the student's research question from multiple viewpoints. During the Fall 2022 semester, however, Professor McBrayer declined to directly share any sources for student-chosen assignments on abortion, because she feared that recommending materials that could be construed as promoting or counseling in favor of abortion would violate the NPFAA. Because of the NPFAA's restrictions, Professor McBrayer feels she cannot effectively advise students who would like to research abortion and who may need to review articles, data sets, or other academic literature that may present viewpoints in favor of abortion.

82.     Professor McBrayer has also altered her grading of student research assignments as a result of the NPFAA. During the Fall 2022 semester, Professor McBrayer sought guidance from the University of Idaho General Counsel's Office on whether her students could still complete research and presentation assignments on abortion under the NPFAA. In response, the General Counsel's Office cautioned:

> Looking at the language of Idaho's [NPFAA,] prohibiting University employees from "promoting abortion", there may be risk involved in such an assignment based on how students view any grading rubric. What is challenging here, in this context, is that current Idaho law criminalizes actions to "promote abortion" in addition to the procedure itself. The risk is that how the assignment is graded could lead to accusations that you are favoring abortion by your grading, whether you intended to or not. This is something that could be raised by a disgruntled student who is

29

simply dissatisfied with their grade. The language of the statute creates this element of risk because of the general language regarding promoting abortion.

83. After re-examining the NPFAA and receiving this guidance, Professor McBrayer determined she could no longer grade research and presentation assignments related to abortion in her "Politics, Policy, and Gender" course and would therefore give every student in the class the same passing grade. If a student were to pursue an abortion-related topic as part of their research and presentation assignment in this course in the future, Professor McBrayer has determined that she would be forced to give everyone the same passing grade, as she did during the Fall 2022 semester. In her Fall 2023 introductory course on "American Politics and Policy," Professor McBrayer plans to completely eliminate a policy brief assignment to avoid the possibility that students will select an abortion-related topic on which she cannot adequately advise or grade them.

84. Professor Turpin has changed his approach to feedback on research papers about abortion in his "Introduction to English Studies" course. During the Spring 2023 semester, some students chose Sallie Tisdale's "We Do Abortions Here"[11] essay as the basis for their final paper, and the papers presented a range of perspectives spanning from pro-abortion to anti-abortion. Professor Turpin was aware of the guidance that Professor McBrayer received regarding how a professor's grading of assignments related to abortion could risk prosecution under the NPFAA. Professor Turpin was concerned that giving any specific written feedback on these papers or grading them could run afoul of the NPFAA. As a result, Professor Turpin gave all papers addressing abortion generic feedback, rather than the substantive and individually tailored feedback he gave to other students, and he graded those papers based on completion, rather than their substance.

---

[11] *See supra* n.6.

85.     Professor Witt has removed prompts regarding abortion for student assignments in her "Human Sexuality for Helping Professionals" and "Human Sexuality in Social Work" courses. One prompt asked students to reflect on whether and when legal restrictions on abortion are appropriate in light of statistics regarding health risks associated with childbirth. The other asked students to reflect on abortion later in pregnancy in the context of a case study on pregnancy loss and fatal fetal anomalies. Professor Witt believes removing these prompts has limited her students' ability to analyze social work principles, such as the right of clients to self-determination, but felt the changes were necessary due to the NPFAA's restrictions on promoting or counseling in favor of abortion.

86.     Members of the Union Plaintiffs have also altered their approach to student research and writing in light of the NPFAA. For example, a member of the UI Federation plans to limit research paper topics to prevent students from choosing abortion when they next teach a course that previously included a unit on abortion and reproductive rights comparing abortion policies in different countries. In past years, students in this course have chosen to research, write, and present on the topic of abortion. In light of the NPFAA, this professor is concerned that if a student chooses to write about abortion, they could not adhere to their normal practice of advising students' topic selections, recommending sources, providing in-depth feedback on drafts, and grading these assignments without risking prosecution for promoting or counseling in favor of abortion.

**C.     Faculty Scholarship**

87.     Because of the NPFAA, professors at Idaho's public universities have also changed their approach to scholarship on abortion or altered their promotion of their scholarship.

88.     Prior to the NPFAA, Professor Johnson began working on a chapter in her book, *Epistemic Care: Vulnerability, Inquiry, and Social Epistemology* (2023). That chapter discussed epistemic rights—*i.e.*, the right to know—and specifically analyzed the argument that individuals

have both positive rights to know certain things and partner rights to give knowledge up—*i.e.*, to *not* know. Professor Johnson analyzed this argument in the abortion context, engaging with the theory that those subject to "Right to Know" abortion laws requiring providers to inform abortion seekers of certain information (such as the anatomical features of a fetus at the time of abortion) should have a corollary right to decline to know that information. This topic interests Professor Johnson greatly and she would like to continue researching it, but due to the NPFAA, she believes she could be subject to prosecution for using any University of Idaho property, materials, or funding to pursue this scholarship. As a result, she does not intend to continue this research so long as the NPFAA applies to her academic speech.

89.     Professor Witt's scholarship focuses on human rights and human sexuality, and much of that work relates to reproductive justice, including access to abortion. Professor Witt currently has a journal article under review, which addresses how the criminalization of abortion impacts the teaching of social work, particularly with respect to reproductive health. Ordinarily, Professor Witt would announce publication of the article at faculty meetings or in e-mails to other faculty members, as is customary at Boise State University. But Professor Witt fears that drawing attention to her academic work may lead to prosecution under the NPFAA. For similar reasons, she plans not to share the article with her students, despite its relevance to her courses. Professor Witt has also limited access to her academic profile and scholarship on the internet. As a result of these changes, other academics and students unfamiliar with Professor Witt's scholarship will be unable to identify her as a potential academic resource with particular expertise in reproductive rights and access to abortion as it relates to social work. Due to the NPFAA, Professor Witt is also reluctant to apply for grants from Boise State University to help defray the costs of attending conferences where she plans to present her work related to abortion and abortion access.

90.     Members of the Union Plaintiffs have likewise changed the way they promote their scholarship in light of the NPFAA. For example, a member of the UI Federation is the author of a book that examines abortion-related topics. This Professor has refrained from promoting the publication of the paperback edition of their book because they fear that the book, and their efforts to promote it, could put them at risk of prosecution under the NPFAA. The Professor's decision not to promote the book limits their ability to engage in meaningful academic discourse about their research and may harm the book's sales, which could impact their ability to obtain research grants or other funding in the future.

91.     Other professors also have concerns about the NPFAA's restrictions on their academic scholarship. As Co-Director of the University of Idaho's Women's, Gender, and Sexuality Studies Program ("WGSS"), Professor Blevins has spoken with faculty about their fear that the NPFAA limits their ability to research and write on topics related to abortion, especially if their research is supported by government grant funding. Whether faculty members may pursue such scholarship has critical career implications, for scholarship bears on any application for tenure or a promotion. As a result, faculty affiliated with WGSS and other non-WGSS faculty have further expressed to Professor Blevins that it is not worthwhile to research and write about abortion and reproductive health.

92.     As a result of Defendants' violations of the First Amendment, the Professor Plaintiffs, members of the Union Plaintiffs, and other faculty members at Idaho's public universities have suffered and will continue to suffer irreparable harm.

93.     The Professor Plaintiffs and members of the Union Plaintiffs have no adequate remedy at law to any of the above-described ongoing violations of their constitutional rights.

III.     **The NPFAA Has Forced Union Plaintiffs to Divert Resources**

94.     In addition to harming members of the Union Plaintiffs, the NPFAA has harmed Union Plaintiffs in their own right, forcing them to divert resources away from their regular activities and toward responding to the NPFAA.

95.     The State Federation ordinarily dedicates its resources to recruiting new members and fighting to improve instructional opportunities and working conditions for its members.

96.     The State Federation has diverted resources from its regular activities in order to obtain guidance and provide support to its members whose academic speech, including teaching and scholarship, is potentially covered by the NPFAA. In his capacity as president of the State Federation, Professor Martin Orr has consulted and coordinated with local federation leadership about member concerns related to the NPFAA; researched the law and its implications for members; and communicated with members across its local federations regarding compliance with the NPFAA, including by providing resources and updates. Since the NPFAA was passed, Professor Orr has spent at least eighty hours, and continues to spend several hours a week, on matters related to the NPFAA. To communicate with local federation leadership and members about the NPFAA, Professor Orr has used State Federation resources, such as the State Federation's membership lists, to disseminate information and communications about the NPFAA. Professor Orr also used State Federation channels to promote an NPFAA-related "Know Your Rights" webinar co-hosted by the State Federation.

97.     The NPFAA has likewise disrupted the activities of the UI Federation. The UI Federation typically dedicates its resources to expanding its membership and advocating for increased salaries and improved working conditions for its members.

98.     The UI Federation has diverted resources from its regular activities in order to obtain guidance and provide support to its members whose academic speech, including teaching

and scholarship, are potentially covered by the NPFAA. Many members have sought counsel from the leadership of the UI Federation, to understand the contours of what they can and cannot teach and say in their classrooms. Professor Luigi Boschetti, the president of the UI Federation from September 2020 to June 2023, dedicated the majority of his time as UI Federation president in the period from September 2022 to June 2023 researching the NPFAA and its implications for members, consulting with outside legal counsel regarding the scope of the NPFAA and its impact on members, and providing advice and resources at meetings and in individual conversations with UI Federation members who were concerned about potential prosecution under the NPFAA. Professor Boschetti and other members of the UI Federation's leadership also diverted time and resources to organize rallies and workshops to raise awareness about the impact of the NPFAA on its members, including by preparing for, promoting, and providing day-of support for these events. Additionally, Professor Boschetti was a speaker at these events, and spent substantial time preparing his remarks on behalf of the UI Federation.

99.     As a result of Defendants' violations of the First Amendment, the Union Plaintiffs have suffered and will continue to suffer irreparable harm.

100.    The Union Plaintiffs have no adequate remedy at law to any of the above-described ongoing violations of their constitutional rights.

## CLAIMS FOR RELIEF

## CLAIM I

## UNCONSTITUTIONAL RESTRICTION ON SPEECH IN VIOLATION OF
## THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

101.    Plaintiffs bring this claim against all Defendants. Plaintiffs incorporate by reference all of the allegations in paragraphs 1 through 100 as set forth herein.

102.    The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." The First Amendment applies to state and local governments under the Fourteenth Amendment to the United States Constitution.

103.    The NPFAA violates the First Amendment by prohibiting Professor Plaintiffs, members of the Union Plaintiffs, and similarly situated individuals at Idaho's public universities from engaging in constitutionally protected speech—and from expressing a particular viewpoint—under the threat of criminal penalties.

104.    The NPFAA is a broad, prospective, content-based, and viewpoint-based restriction on academic speech.

105.    Academic speech is protected by the First Amendment. The impact of academic speech about, or in favor of, abortion on the actual operation of the government, if any, is not sufficient to outweigh the interests of a large group of present and future employees and their potential audiences in a broad range of present and future expression about, or in favor of, abortion. *See United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 468 (1995).

106.    Because the NPFAA imposes a broad, prospective, content-based, and viewpoint-based restriction on academic speech about abortion that inflicts harms that the Defendants cannot prove are outweighed by any impact on the actual operation of the government, the NPFAA violates the First Amendment to the U.S. Constitution.

## CLAIM II

### UNCONSTITUTIONAL VAGUENESS IN VIOLATION OF
### THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION

107.    Plaintiffs bring this claim against all Defendants. Plaintiffs reallege and incorporate by reference all of the allegations in paragraphs 1 through 100 as set forth herein.

108.    The Due Process Clause of the Fourteenth Amendment prohibits laws that are unconstitutionally vague.

109.    The NPFAA is unconstitutionally vague on its face and as applied to Plaintiffs. It fails to provide fair notice about what speech is prohibited and, in particular, what section 18-8705 means when it prohibits using public funds to "promote abortion" or "counsel in favor of abortion." Idaho Code § 18-8705(1).

110.    Without a well-defined standard of criminal responsibility, law enforcement officials have nearly unfettered discretion to apply their own standards. The NPFAA therefore invites arbitrary and discriminatory enforcement.

111.    Because the NPFAA fails to provide fair notice to enable ordinary people to understand what speech the statute prohibits and invites arbitrary and discriminatory enforcement, the NPFAA is unconstitutionally vague and violates the Fourteenth Amendment to the U.S. Constitution. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

A.    Declare that the NPFAA violates the First Amendment as applied to academic speech at Idaho's public universities, including academic instruction, course content, classroom discussion, advising and grading of student research and writing, and academic scholarship of the Professor Plaintiffs, members of the Union Plaintiffs, and similarly situated individuals at Idaho's public universities;

B.    Declare that the NPFAA violates the Fourteenth Amendment both on its face and as applied to the academic instruction, course content, classroom discussion, advising and grading of student research and writing, and academic scholarship of the Professor Plaintiffs, members of the Union Plaintiffs, and similarly situated individuals at Idaho's public universities;

37

C.     Issue preliminary and permanent injunctive relief restraining Defendants and their employees, agents, and successors in office from enforcing the NPFAA with respect to speech "promot[ing]" and "counsel[ing] in favor of" abortion;

D.     Issue preliminary and permanent injunctive relief restraining Defendants and their employees, agents, and successors in office from enforcing the NPFAA with respect to academic speech, including speech related to academic instruction, course content, classroom discussion, advising and grading of student research and writing, and academic scholarship of Professor Plaintiffs, members of the Union Plaintiffs, and similarly situated individuals at Idaho's public universities;

E.     Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1998;

F.     Grant such other and additional relief as the Court deems just or appropriate.


Dated: August 8, 2023                              Respectfully submitted,

Samir Deger-Sen*
Peter Trombly*†
Margaret Babad*
Emily True*
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
samir.deger-sen@lw.com
peter.trombly@lw.com
molly.babad@lw.com
emily.true@lw.com

Danielle Conley*
Margaret A. Upshaw*
Cherish A. Drain*
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200
Fax: (202) 637-2201
danielle.conley@lw.com
maggie.upshaw@lw.com
cherish.drain@lw.com

Marissa Marandola*
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Tel: (617) 948-6000
Fax: (617) 948-6001
marissa.marandola@lw.com

Amanda Barnett*
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: (213) 485-1234
Fax: (213) 891-8763
amanda.barnett@lw.com

/s/ Erika Birch
Erika Birch (ISB No. 7831)
Strindberg Scholnick Birch
  Hallam Harstad Thorne
American Civil Liberties Union of
  Idaho Foundation Cooperating Attorney
1516 W Hays St.
Boise, Idaho 83702
Tel: (208) 336-1788
erika@idahojobjustice.com

Scarlet Kim*
Andrew Beck*
Elizabeth Gyori*
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
Fax: (212) 549-2649
scarletk@aclu.org
abeck@aclu.org
egyori@aclu.org

Dina Flores-Brewer (ISB No. 6141)
American Civil Liberties Union of
  Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

Seth Kreimer*
3501 Sansom Street
Philadelphia, PA
skreimer@law.upenn.edu

* Pro hac vice applications forthcoming
†Admitted to practice in Virginia only