Erika Birch (ISB No. 7831)
Strindberg Scholnick Birch
  Hallam Harstad Thorne
American Civil Liberties Union of
  Idaho Foundation Cooperating Attorney
1516 W. Hays Street
Boise, Idaho 83702
Tel: (208) 336-1788
erika@idahojobjustice.com

Danielle Conley*
Margaret A. Upshaw*
Cherish A. Drain*
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200
Fax: (202) 637-2201
danielle.conley@lw.com
maggie.upshaw@lw.com
cherish.drain@lw.com

Scarlet Kim*
Andrew Beck*
Elizabeth Gyori*
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
Fax: (212) 549-2649
scarletk@aclu.org
abeck@aclu.org
egyori@aclu.org

Samir Deger-Sen*
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
samir.deger-sen@lw.com

*Attorneys for Plaintiffs*

* *Pro hac vice applications forthcoming*          *Additional attorneys listed on next page*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION**

| | |
|---|---|
| IDAHO FEDERATION OF TEACHERS et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al., <br><br> *Defendants*. | Case No. 1:23-cv-353 <br><br><br> **<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>** |

Peter Trombly*†
Margaret Babad*
Emily True*
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
peter.trombly@lw.com
molly.babad@lw.com
emily.true@lw.com

Marissa Marandola*
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Tel: (617) 948-6000
Fax: (617) 948-6001
marissa.marandola@lw.com

*Pro hac vice applications forthcoming*

† *Admitted to practice in Virginia only*

Dina Flores-Brewer (ISB No. 6141)
American Civil Liberties Union of
  Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

Amanda Barnett*
Latham & Watkins LLP
355 S. Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: (213) 485-1234
Fax: (213) 891-8763
amanda.barnett@lw.com

Seth Kreimer*
3501 Sansom St.
Philadelphia, PA
skreimer@law.upenn.edu

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

    A.    The No Public Funds for Abortion Act ................................................. 2

    B.    The NPFAA's Impact on Academic Speech .......................................... 4

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims ........................... 7

        A.    The NPFAA Is a Broad, Prospective, Viewpoint-Based Restriction on Academic Speech that Violates the First Amendment ......................... 7

        B.    The NPFAA Is Void for Vagueness ......................................................... 13

    II.    Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm ........... 18

    III.    The Balance of Equities and Public Interest Favor an Injunction ........................ 19

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Trs. of Univ. of N.C.-Wilmington*,
 640 F.3d 550 (4th Cir. 2011) .......................................................................... 7

*Am. Beverage Ass'n v. City & County of San Francisco*,
 916 F.3d 749 (9th Cir. 2019) ..................................................................... 18, 19

*Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*,
 39 F.4th 95 (3d Cir. 2022) ............................................................................. 11

*Barone v. City of Springfield*,
 902 F.3d 1091 (9th Cir. 2018) .................................................................. 10, 11

*Blum v. Schlegel*,
 18 F.3d 1005 (2d Cir. 1994) ........................................................................... 11

*Buchanan v. Alexander*,
 919 F.3d 847 (5th Cir. 2019) ........................................................................... 7

*Butcher v. Knudsen*,
 38 F.4th 1163 (9th Cir. 2022) ........................................................................ 13

*City of Chicago v. Morales*,
 527 U.S. 41 (1999) ......................................................................................... 13

*Coates v. City of Cincinnati*,
 402 U.S. 611 (1971) ....................................................................................... 15

*Connick v. Myers*,
 461 U.S. 138 (1983) ..................................................................................... 8, 9

*Crue v. Aiken*,
 370 F.3d 668 (7th Cir. 2004) ........................................................................ 8, 9

*Cuviello v. City of Vallejo*,
 944 F.3d 816 (9th Cir. 2019) ......................................................................... 18

*Demers v. Austin*,
 746 F.3d 402 (9th Cir. 2014) ........................................................................... 7

*Dobbs v. Jackson Women's Health Organization*,
 142 S. Ct. 2228 (2022) .................................................................................... 3

*Doe v. Harris*,
 772 F.3d 563 (9th Cir. 2014) .................................................................... 18, 19

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ................................................................. 13

*First Resort, Inc. v. Herrera*,
  860 F.3d 1263 (9th Cir. 2017) ................................................. 17

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ................................................................... 7

*Hernandez v. City of Phoenix*,
  43 F.4th 966 (9th Cir. 2022) ................................................... 10

*Hunt v. City of Los Angeles*,
  638 F.3d 703 (9th Cir. 2011) ................................................... 15

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  138 S. Ct. 2448 (2018) ............................................................... 8

*Johnston v. Koppes*,
  850 F.2d 594 (9th Cir. 1988) ..................................................... 8

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967) .......................................................... passim

*Kinney v. Weaver*,
  367 F.3d 337 (5th Cir. 2004) ................................................... 10

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ................................................. 18

*Lane v. Franks*,
  573 U.S. 228 (2014) ................................................................ 7, 9

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ................................................ 7, 12

*N.J. Right to Life Pol. Action Comm. v. Gardner*,
  99 F.3d 8 (1996) ....................................................................... 19

*Perlot v. Green*,
  609 F. Supp. 3d 1106 (D. Idaho 2022) ...................................... 6

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*,
  391 U.S. 563 (1968) .......................................................... passim

*Planned Parenthood of Cent. & N. Ariz. v. Arizona*,
  718 F.2d 938 (9th Cir. 1983) ................................................... 17

*Puente Ariz. v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) ................................................................. 6

*Recycle for Change v. City of Oakland*,
    856 F.3d 666 (9th Cir. 2017) ................................................................. 6

*Reno v. ACLU*,
    521 U.S. 844 (1997) ............................................................................ 13

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ............................................................. 20

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) ............................................................................ 18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................... 10, 11, 14

*Sanjour v. Env't Prot. Agency*,
    56 F.3d 85 (D.C. Cir. 1995) ................................................................ 12

*Santa Cruz Lesbian and Gay Comm'y Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ........................................... 14, 15

*Short v. Brown*,
    893 F.3d 671 (9th Cir. 2018) ................................................................. 6

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ........................................................... 12

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ................................................................. 9, 10, 20

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ............................................................. 17

*United States v. Miselis*,
    972 F.3d 518 (4th Cir. 2020) .............................................................. 14

*United States v. Nat'l Treasury Emps. Union* (*NTEU*),
    513 U.S. 454 (1995) ..................................................................... passim

*United States v. Rundo*,
    990 F.3d 709 (9th Cir. 2021) .............................................................. 14

*United States v. Williams*,
    553 U.S. 285 (2008) ............................................................................ 15

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ................................................................................ 20

*Wieman v. Updegraff*,
   344 U.S. 183 (1952) ................................................................................ 11

**Statutes**

Idaho Code § 18-5702 ................................................................................. 3

No Public Funds for Abortion Act,
   Idaho Code § 18-8701 et seq. (2021) ..................................................... 2

Idaho Code § 18-8705 ................................................................................. 1

Idaho Code § 18-8705(1) ............................................................................ 2

Idaho Code § 18-8705(2) ............................................................................ 2

Idaho Code § 18-8709 ................................................................................. 3

**Other Authorities**

*Counsel*, Merriam-Webster Dictionary (online ed., last modified Aug. 1, 2023) ........................ 14

*Counsel*, Oxford English Dictionary (online ed., last modified July 2023) ................................. 14

Idaho Dep't of Health & Welfare, *Maternal Mortality Review Committee* ................................. 15

*Promote*, Merriam-Webster Dictionary (online ed., last modified Aug. 4, 2023) ........................ 14

*Promote*, Oxford English Dictionary (online ed., last modified July 2023) ................................. 14

*To counsel a thing*, Oxford English Dictionary (online ed., last modified July 2023) ................. 14

## INTRODUCTION

This case challenges the No Public Funds for Abortion Act ("NPFAA"), a broad, prospective, and viewpoint-discriminatory prohibition on speech that has chilled academic discussion about abortion across Idaho's public universities. The Supreme Court has long emphasized that because "[o]ur Nation is deeply committed to safeguarding academic freedom," the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). The NPFAA has suppressed divergent viewpoints in the classroom by imposing harsh criminal penalties on any public employee who uses public funds to "promote abortion" or "counsel in favor of abortion." Idaho Code § 18-8705. As a result, Plaintiffs—faculty at Idaho's public universities ("Professor Plaintiffs"), as well as two unions with faculty membership across those universities ("Union Plaintiffs")—fear criminal prosecution and have been chilled in their teaching and scholarship on abortion across a wide array of disciplines.

The NPFAA's prohibitions on academic speech about abortion are flatly unconstitutional under settled First Amendment law. The statute threatens professors with up to fourteen years of imprisonment and other harsh penalties for continuing to teach and publish materials that are central to the study of their academic disciplines. And it does so despite the fact that there is no harm to the "actual operation" of government from permitting professors to educate their students as they have done for years. *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 468 (1995) (citation omitted); *see also Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968). To the contrary, the operation of public education is best served by permitting the "robust exchange of ideas" that is the lifeblood of our democracy. *Keyishian*, 385 U.S. at 603. This outrageous effort to suppress disfavored speech in the classroom must be firmly rejected.

1

The NPFAA's prohibitions are also unconstitutionally vague in violation of the Fourteenth Amendment Due Process Clause. The statute prohibits speech that "promote[s]" or "counsel[s] in favor of" abortion without offering any clarity as to what these prohibitions mean. Do they include, for example, arguments in favor of abortion during a debate on the topic, public health data demonstrating advantages to abortion access, or discussion of medical circumstances where abortion might improve health outcomes? This uncertainty impacts public employees in a wide range of circumstances, but it is especially troubling for faculty at Idaho's public universities, who must guess at what material they may assign, what perspectives they may discuss, and what scholarship they may undertake without risking criminal penalties. And that lack of clarity also opens the door to arbitrary and discriminatory enforcement against disfavored speakers.

Absent prompt relief from this Court, the NPFAA will continue to violate Plaintiffs' constitutional rights and prevent Plaintiffs from teaching and writing on a subject of great social, moral, and public importance. This Court should therefore grant preliminary injunctive relief to lift the unconstitutional restriction on speech imposed by the NPFAA.

## FACTUAL BACKGROUND

### A.    The No Public Funds for Abortion Act

The NPFAA imposes a range of restrictions on the use of public funds, including restrictions on speech, related to abortion. Idaho Code §§ 18-8701–8711. As relevant here, the NPFAA provides:

> No public funds . . . shall be used in any way to provide, perform, or induce an abortion; assist in the provision or performance of an abortion; *promote* abortion; *counsel in favor* of abortion; refer for abortion; or provide facilities for an abortion or for training to provide or perform an abortion.

*Id*. § 18-8705(1) (emphasis added). The NPFAA also provides that "[n]o person" who "receives [public] funds may use those funds to . . . promote abortion." *Id*. § 18-8705(2). The statute does

not define the terms "promote" or "counsel in favor of." The NPFAA imposes criminal penalties for violations of the statute, with public employees subject to misdemeanor or felony liability, imprisonment for up to fourteen years, and fines of up to $10,000. *Id.* §§ 18-8709, 18-5702. The NPFAA also mandates that a public employee who pleads guilty or is found guilty must be terminated "for cause" and make restitution of public funds. *See id.* § 18-5702(5)(a)–(b).

In the wake of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), several of Idaho's public universities attempted to issue guidance on the NPFAA's application to academic speech relating to abortion. On September 23, 2022, the University of Idaho ("UI") General Counsel's Office issued a memorandum stating that the NPFAA covers classroom discussions on abortion and that "[a]cademic freedom is not a defense to violation of law." Kim Decl. Ex. 1 at 6. The Office advised that professors must "remain neutral on the topic" of abortion and risk "[m]isdemeanor or felony convictions (with imprisonment and fines)" if they fail to do so. *Id.* at 2, 6. The Office subsequently followed up with a "Frequently Asked Questions" document that, in response to the question, "Can I teach or talk about abortion in my class?," states that although "[t]he *university* encourages faculty to engage in educational discussions on topics of their choice," the NPFAA "applies criminal penalties to individuals" and "is vague in many respects which creates uncertainty as to the extent of the law." Kim Decl. Ex. 3 at 2 (emphasis added); *see also* Kim Decl. Ex. 2 at 1 (UI President stating that, while UI supports academic freedom, the NPFAA is "complex, unclear, and written to be punitive for state employees").

Similarly, Boise State University ("BSU") issued a "Frequently Asked Questions" document in September 2022 that offered little in the way of direction, noting that under the NPFAA, "curriculum and training could include general information and educational materials

3

that discuss abortion," but only "so long as [the material] does not engage in prohibited activity," such as promoting abortion, "in so doing." Kim Decl. Ex. 4 at 2. Idaho State University ("ISU") issued no written guidance but, in conversations with faculty seeking guidance, urged caution when teaching, researching, or writing about topics related to abortion. State Fed'n Decl. ¶ 16.

In November 2022, Plaintiffs' counsel sought assurances from the County Prosecuting Attorney Defendants that they would not enforce the NPFAA against individuals engaged in academic speech. *See* Kim Decl. Exs. 5–7. None of these Defendants responded to these requests for assurances.

On January 11, 2023, Representative Bruce Skaug introduced a bill that proposed, among other things, to define the term "promote" in the NPFAA to exclude "any classroom discussion on the subject of abortion at a school, college, or university," Kim Decl. Ex. 8 at 3, so that the NPFAA would not "limit discussion regarding abortion within classrooms," Kim Decl. Ex. 9. But that bill was never brought to a vote, and the NPFAA's broad prohibitions thus remain in force.

**B.     The NPFAA's Impact on Academic Speech**

The NPFAA has had a severe impact on academic inquiry and discourse at Idaho's public universities. Faced with the threat of criminal penalties for engaging in any academic speech that could be construed as promoting or counseling in favor of abortion, professors—including the Professor Plaintiffs and members of the Union Plaintiffs—have dramatically altered their academic speech across a range of disciplines, jeopardizing their ability to effectively teach their courses and to research and write in their areas of expertise.

In courses on philosophy, history, literature, political science, sociology, journalism, social work, and more, Plaintiffs have removed materials—and even entire modules—addressing abortion and curtailed class discussion on the topic. As just one example, Professor Aleta Quinn excised a module on human reproduction from her "Biomedical Ethics" course—forgoing reading

assignments and class discussion on one of the most salient and significant topics in bioethics for fear of prosecution under the NPFAA. Quinn Decl. ¶¶ 20–21. Professor Casey Johnson made similar changes in two ethics courses, removing the option for students to choose abortion as a module and, as a result, omitting from those courses materials—including Judith Jarvis Thomson's *A Defense of Abortion*, a seminal work of applied ethics—and related class discussion. Johnson Decl. ¶¶ 17–20. Professor Markie McBrayer likewise pulled a planned lecture and class discussion on abortion policy from a political science course for fear of violating the NPFAA. McBrayer Decl. ¶ 21.[1] Even those professors who continue to assign materials or permit discussion on abortion in their courses in some fashion have been forced to censor their speech in various ways, including by deemphasizing the topic, altering the structure of discussion, or offering disclaimers that have dampened class discussion.[2] And others who have chosen not to change their teaching or materials still fear prosecution for their conduct. *See, e.g.*, State Fed'n Decl. ¶¶ 28–30, 41.

The NPFAA has similarly changed how professors treat student research and writing assignments related to abortion. Some professors have simply removed such assignments from their courses.[3] Others have altered their guidance and feedback, in some cases avoiding recommending external resources on abortion or providing other advice on the research process, and, in other cases, refraining from providing any substantive feedback altogether.[4] And some professors have determined that they can no longer grade assignments on abortion,[5] a precaution

---

[1] *See also* Witt Decl. ¶¶ 21–22; UI Fed'n. Decl. ¶¶ 16, 28; State Fed'n. Decl. ¶¶ 21–22, 33–34.

[2] *See* Turpin Decl. ¶¶ 25–28; Blevins Decl. ¶¶ 21, 23, 27–28; UI Fed'n Decl. ¶¶ 22, 24; State Fed'n Decl. ¶¶ 37–39.

[3] *See* Quinn Decl. ¶ 26; McBrayer Decl. ¶ 30; Witt Decl. ¶ 23; UI Fed'n Decl. ¶ 17.

[4] *See* Johnson Decl. ¶¶ 22–23; McBrayer Decl. ¶ 22; Turpin Decl. ¶¶ 29–30.

[5] *See* Quinn Decl. ¶ 26; McBrayer Decl. ¶¶ 23–24; Turpin Decl. ¶ 30; UI Fed'n Decl. ¶ 17.

endorsed by the UI General Counsel's Office, which warned one Plaintiff that grading student assignments addressing abortion policy could lead to "accusations that you are favoring abortion by your grading." McBrayer Decl. ¶ 15; McBrayer Decl. Ex. A at 1.

The NPFAA's chilling effect has also extended beyond the classroom, curtailing faculty scholarship. For example, Professor Johnson, who has previously written on philosophical issues related to abortion, no longer feels comfortable pursuing such scholarship. Johnson Decl. ¶ 27. Other professors have refrained from publicizing their scholarship that touches on abortion. *See* Witt Decl. ¶¶ 26–30; UI Fed'n Decl. ¶ 29. And still others have expressed uncertainty as to whether abortion-related research may support their candidacies for tenure and promotion and have therefore avoided such scholarship. *See* Blevins Decl. ¶¶ 32–34.

As professors and students head back to campuses this fall, the NPFAA will continue to deprive professors, including Plaintiffs, of their ability to teach freely and effectively and will dampen the spirit of intellectual inquiry that is meant to define university campuses.

## LEGAL STANDARD

In deciding whether to grant a preliminary injunction, the Court must consider whether (1) Plaintiffs are likely to succeed on the merits; (2) Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Perlot v. Green*, 609 F. Supp. 3d 1106, 1115 (D. Idaho 2022) (citing *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018)). "[A] stronger showing of one element may offset a weaker showing of another . . . ." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (citation omitted). A preliminary injunction is thus warranted even when a plaintiff raises only "serious questions" on the merits so long as "the balance of hardships tips sharply in [the plaintiff's] favor." *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016) (citation omitted). Plaintiffs readily satisfy each factor.

## ARGUMENT

I.     **Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

     A.     **The NPFAA Is a Broad, Prospective, Viewpoint-Based Restriction on Academic Speech that Violates the First Amendment**

Over fifty years ago, the Supreme Court "declared that citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (citing *Pickering*, 391 U.S. at 563). That principle is at its apex in the context of public universities, where employee speech frequently implicates academic freedom, "a special concern of the First Amendment." *Keyishian*, 385 U.S. at 603. Accordingly, while the Supreme Court's "customary employee-speech jurisprudence" does not recognize First Amendment protections for speech made "pursuant to . . . official duties," *Garcetti v. Ceballos*, 547 U.S. 410, 421, 425 (2006), that principle "does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor," *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014).[6]

Rather, First Amendment protection for academic speech at public universities depends on a balance "between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Furthermore, where—as here—the government imposes a "statutory restriction on expression," as opposed to "an isolated disciplinary action," the government bears a heavier burden to justify that restriction. *NTEU*, 513

---

[6] Because "academic scholarship" and "classroom instruction" implicate unique "constitutional interests," *Garcetti*, 547 U.S. at 425, other circuits have likewise held that *Garcetti* does not apply to "core academic functions, such as teaching and scholarship," *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021). *See also Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 563–64 (4th Cir. 2011); *cf. Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

U.S. at 468; *see also Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2004) (applying *NTEU*'s heightened standard to university directive because it was "a broad prohibition on speech," not discipline "for a single statement"). Such prospective restrictions act as a "wholesale deterrent to a broad category of expression," imposing "a significant burden" not only on prospective speakers, but also "on the public's right to read and hear what the employees would otherwise have written and said." *NTEU*, 513 U.S. at 467, 470. Accordingly, to justify such a restriction, the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the [g]overnment." *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571). This test "more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018).

The NPFAA—a broad, prospective, statutory ban on public-employee speech—is therefore unconstitutional if (1) it restricts speech on a matter of public concern, and (2) the government fails to meet its burden of demonstrating that the restricted speech is so harmful to the actual operation of the government that the impact on the government outweighs the restriction on speech. As applied to academic speech, the NPFAA unquestionably fails that test. *First*, Plaintiffs' academic speech about abortion plainly addresses "matters of great public concern" on which "[t]he consciences of citizens are divided." *Johnston v. Koppes*, 850 F.2d 594, 596 (9th Cir. 1988); *see also Connick v. Myers*, 461 U.S. 138, 146 (1983) (employee speech addresses a matter of public concern when it relates "to any matter of political, social, or other concern to the community"). Abortion is a topic that ignites debate in legal, medical, academic, and religious communities, and has prompted divergent legislative and policy approaches across the country. Thus, when Plaintiffs seek to address abortion as a topic of teaching and scholarship, they are not

doing so out of mere "personal interest," but to teach on "'a matter of legitimate and public concern' upon which 'free and open debate is vital to informed decision-making by the electorate.'" *Connick*, 461 U.S. at 145 (quoting *Pickering*, 391 U.S. at 571–72).[7]

*Second*, the free speech interests of Plaintiffs, other faculty members, students, and the public drastically outweigh any impact such expression might have on "the actual operation of the government." *NTEU*, 513 U.S. at 468. The NPFAA's prospective restriction on promoting or counseling in favor of abortion "chills potential speech before it happens," infringing on the First Amendment interests of a vast swath of professors at Idaho's public universities. *Id.*; *see also Crue* 370 F.3d at 679–80 (recognizing "substantial" "free-speech interest" of "members of a major public university community" in questioning university mascot). Plaintiffs previously taught, discussed, and wrote about abortion across a diverse array of disciplines, including philosophy, history, literature, political science, sociology, journalism, and social work. But because of the NPFAA, they have suppressed their academic speech, excising entire modules and reading assignments out of their curricula, removing lectures, stifling class discussion, altering feedback and grading on student research and writing, and avoiding their own pursuit or promotion of scholarship. *See supra* 4–6 & nn.1–5. The NPFAA's "large-scale disincentive" to engage in academic speech about abortion "also imposes a significant burden" on the interests of their "potential audiences," *NTEU*, 513 U.S. at 469, 470—the students who are deprived of access to professors' knowledge and teaching, the fellow academics who thrive by exchanging ideas and

---

[7] Indeed, considering that "[n]o field of education is so thoroughly comprehended by man that new discoveries cannot be made," *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957), professors' expertise in any field is typically speech on a matter of public concern—"that is, a subject of general interest and of value and concern to the public," *Lane*, 573 U.S. at 241 (citation omitted).

scholarship, and the broader public, which also benefits from the "robust exchange of ideas" on issues of significant public concern like abortion, *Keyishian*, 385 U.S. at 603.

The government cannot demonstrate that these significant free speech interests are "outweighed by that expression's 'necessary impact on the actual operation' of the [g]overnment." *NTEU*, 513 U.S. at 468 (citation omitted); *see also Kinney v. Weaver*, 367 F.3d 337, 362 (5th Cir. 2004) (en banc) (explaining that only "the speech's detrimental effect on the efficient delivery of public services . . . gives the government a legitimate interest in suppressing it"). The government must demonstrate "real, not merely conjectural" harms and that "the proposed restriction . . . 'in fact alleviate[s] these harms in a direct and material way.'" *Hernandez v. City of Phoenix*, 43 F.4th 966, 980 (9th Cir. 2022) (quoting *NTEU*, 513 U.S. at 475); *see also Barone v. City of Springfield*, 902 F.3d 1091, 1106 (9th Cir. 2018) (requiring "a sufficiently 'close and rational relationship' between [the government] interest and [the] broad prohibition on speech" (citation omitted)). And because academic speech has a particularly high "value . . . in advancing First Amendment interests," the government's interest must be correspondingly weightier. *Hernandez*, 43 F.4th at 977; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995) (explaining that "danger" of chilling speech "is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition").

Here, there is *no* government interest that is furthered by the NPFAA's speech restrictions. Whatever the government's interests may be in regulating abortion, it cannot demonstrate that *academic speech* about abortion has any "real" "impact on the actual operation" of the government. *NTEU*, 513 U.S. at 468, 475. To the contrary, in the public education context, the government's paramount interest is to "guide and train our youth," *Sweezy*, 354 U.S. at 250, and "the efficient

provision of services by a State university[] actually depends . . . on the dissemination . . . of controversial speech implicating matters of public concern," *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994). Censoring major works of philosophy, Quinn Decl. ¶¶ 18, 22; Johnson Decl. ¶ 20; discussion of abortion policy, McBrayer Decl. ¶ 21; and contemporary scholarship on social work principles, Witt Decl. ¶¶ 21–23, is antithetical to that interest and the role professors play as "exemplars of open-mindedness and free inquiry," *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring). And even if the government could articulate any harm from this expression, it cannot demonstrate that the NPFAA's sweeping restriction is sufficiently "tailored to speech that implicates the [government]'s justifications." *Barone*, 902 F.3d at 1106.

The NPFAA's prohibition on speech is particularly pernicious for two additional reasons. *First*, the NPFAA is viewpoint discriminatory. It prohibits only speech that promotes or counsels in *favor* of abortion, while permitting academic speech that denounces or counsels against abortion. In other words, a professor teaching a philosophy course can safely assign *only* texts arguing that abortion is wrongful, thus skewing the debate in favor of the government's preferred position. Such viewpoint-based discrimination is "an egregious form of content discrimination," and "[t]he government must abstain from [it]." *Rosenberger*, 515 U.S. at 829. "That is no less true in the *Pickering-NTEU* context . . . ." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022) (citing *Rosenberger*, 515 U.S. at 828).

After all, viewpoint discrimination "raise[s] the specter of Government control over the marketplace of ideas." *NTEU*, 513 U.S. at 490, 500 & n.6 (Rehnquist, C.J., dissenting) (stating that whether a statute discriminates based on viewpoint is an "important factor[] in evaluating the reasonableness of the public employer's action"). And the government's stranglehold on the expression of certain viewpoints is particularly anathema in the university setting because "[t]he

classroom is peculiarly the 'marketplace of ideas,'" designed to provide "wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603; *see also Meriwether*, 992 F.3d at 507 ("[The government] do[es] not have a license to act as classroom thought police" or to "force professors to avoid controversial viewpoints altogether in deference to a state-mandated orthodoxy."); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) ("[T]he dangers of viewpoint discrimination are *heightened* in the university setting." (citation omitted)).

Under these bedrock First Amendment principles, the NPFAA's viewpoint-discriminatory prohibitions are plainly unconstitutional. But even if public employers may engage in viewpoint-based discrimination in some instances, its presence "justifies an additional thumb on the employees' side of [the] scales" in the *NTEU* analysis. *Sanjour v. Env't Prot. Agency*, 56 F.3d 85, 97 (D.C. Cir. 1995) (holding regulatory scheme unconstitutional where it "vest[ed] essentially unbridled discretion in the agency to make [] determination[s] based on [] viewpoint"). And here, the scales tip overwhelmingly in favor of Plaintiffs.

*Second*, the NPFAA's speech restriction is especially harmful, because it imposes draconian *criminal* penalties, which are wildly disproportionate—especially in the context of academic speech. Under the NPFAA, a professor faces the risk of over a decade in prison simply for assigning a celebrated work of applied ethics to her students. That extreme sanction is utterly unprecedented. The typical penalty for academic employee speech is administrative in nature and, in the most serious cases, results in termination of employment. Plaintiffs are aware of no other prospective *and* viewpoint-discriminatory statutory restriction on academic employee speech that levies such penalties. *See Pickering*, 391 U.S. at 574 (noting that "criminal sanctions" have a "different impact" on free speech than "dismissal from employment"); *Reno v. ACLU*, 521 U.S.

844, 871–72 (1997) (emphasizing increased chilling effect of criminal penalties). The NPFAA's

application of drastic criminal penalties to academic speech is patently unconstitutional.

> **B.        The NPFAA Is Void for Vagueness**

A law is impermissibly vague if it either "fail[s] to provide the kind of notice that will

enable ordinary people to understand what conduct it prohibits" or "authorize[s] and even

encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41,

56 (1999) (opinion of Stevens, J.). "When speech is involved, rigorous adherence to those

requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox

Television Stations, Inc.*, 567 U.S. 239, 253–55 (2012); *see also Butcher v. Knudsen*, 38 F.4th

1163, 1165 (9th Cir. 2022) ("[P]rotections against impermissibly vague laws . . . are at their

maximum" in the First Amendment context.). In the education context in particular, the "chilling

effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools

which clearly inform teachers what is being proscribed." *Keyishian*, 385 U.S. at 604. Furthermore,

where a law carries criminal, rather than civil, penalties, the test for vagueness is even more

demanding because the "severity of criminal sanctions may well cause speakers to remain silent

rather than communicate even arguably unlawful words, ideas, and images." *Reno*, 521 U.S. at

871–72.

Under these principles, the NPFAA's prohibitions on "promot[ing]" or "counsel[ing] in

favor of" abortion must be subject to the most exacting vagueness standard, because they expressly

restrict speech—including in the academic context—and carry substantial criminal penalties. The

NPFAA cannot satisfy this standard: It fails to provide fair notice about what speech is prohibited

and invites arbitrary and discriminatory enforcement against disfavored speakers.

Neither "promote" nor "counsel in favor of" is defined in the NPFAA. The ordinary

meaning of "promote" is "[t]o further the growth, development, progress, or establishment of," "to

advance or actively support," or "to encourage."[8] Similarly, "counsel" is generally defined as "to advise."[9] And when used as phrased in the NPFAA—to "counsel in favor of" abortion—its ordinary meaning is "to advise [the] adoption or doing [of a thing]; to recommend."[10] These terms are expansive and highly subjective—information or ideas may "further," "advance," or "recommend" abortion for one listener, while appearing neutral about abortion for another. And they encompass a wide range of expressive activity—from outright advocacy in favor of abortion, to information that implies the benefits of abortion for some pregnant people, to conversations that inform a person of the risks of continuing a pregnancy.

Consistent with these definitions, multiple courts have recognized that terms like "promote" and "counsel" are susceptible to a "wide range of meanings depending on context." *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (prohibition on "encourag[ing]" or "promot[ing]" a riot was overbroad);[11] *see also United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (same, explaining that "encourage" and "promote" could mean "to recommend, advise"), *cert. denied*, 142 S. Ct. 865 (2022); *Rosenberger*, 515 U.S. at 836 (emphasizing "vast potential reach" of term "promote[]"). In *Santa Cruz Lesbian and Gay Community Center v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020), for example, the court held that an executive order was unconstitutionally vague where it contemplated conditioning federal grant programs on a

---

[8] *Promote*, Oxford English Dictionary (online ed., last modified July 2023); *see also Promote*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/promote (online ed., last modified Aug. 4, 2023) ("to contribute to the growth or prosperity of: further").

[9] *Counsel*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/counsel (online ed., last modified Aug. 1, 2023); *see also Counsel*, Oxford English Dictionary (online ed., last modified July 2023) ("To give or offer counsel or advice to (a person); to advise").

[10] *To counsel a thing*, Oxford English Dictionary (online ed., last modified July 2023).

[11] Because the court found those statutory terms overbroad, it had no occasion to resolve whether they were also unconstitutionally vague. *Miselis*, 972 F.3d at 546.

recipient's certification that they would not use federal funds to "promote" certain race- and sex-related concepts. *Id.* at 543. The court held that this language—as well as interpretive guidance stating that grant recipients were prohibited from "teach[ing] or impl[ying]" these concepts—resulted in a "lack of clarity" and "pose[d] a danger of arbitrary and discriminatory application." *Id.* at 543–44 (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011)).

That same uncertainty plagues the NPFAA. The prohibitions on "promot[ing]" and "counsel[ing] in favor of" may cover a vast range of expressive activities that "further" or "advance" abortion or that "recommend" abortion as an appropriate option, including outside the academic context. For example, these terms could potentially encompass proposed legislation to scale back Idaho's criminalization of abortion; objective public health data or statistical analyses that imply advantages to abortion access; or discussion of medical, social, or familial circumstances where abortion might improve health outcomes.[12] But whether such speech ultimately "promote[s]" or "counsel[s] in favor" of abortion depends entirely on the subjective perceptions of the listener. Such "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" are constitutionally intolerable. *United States v. Williams*, 553 U.S. 285, 306 (2008); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding that a law criminalizing "annoying" conduct was unconstitutionally vague because "[c]onduct that annoys some people does not annoy others," and the law thus failed to specify any standard of conduct or appropriately constrain enforcement discretion); *Hunt*, 638 F.3d at 707 (striking down law that would require officers to engage in a "highly fact-specific analysis" to

---

[12] *See, e.g.*, Idaho Dep't of Health & Welfare, *Maternal Mortality Review Committee*, https://healthandwelfare.idaho.gov/about-dhw/boards-councils-committees/maternal-mortality-review-committee (state committee established to analyze maternal deaths).

determine whether messages on merchandise were "religious, political, philosophical, or ideological," leaving enforcement to their "subjective judgment").

These concerns are particularly acute in the academic context, as Plaintiffs' own academic speech demonstrates. Do the terms "promote" or "counsel in favor of" cover, for example, the presentation of bioethical concepts of bodily autonomy or personhood in the abortion context? Quinn Decl. ¶¶ 12, 16, 18, 21; Johnson Decl. ¶ 21. Or statistical research demonstrating that the legalization of abortion can decrease maternal mortality rates? UI Fed'n Decl. ¶ 16. Do they cover lectures and class discussion on "the disjuncture between public opinions and abortion policy in states that restrict abortion," McBrayer Decl. ¶ 21, or how feminist theory has addressed the right to access abortion, Blevins Decl. ¶¶ 19–21? What about asking students to reflect on abortion in the context of fatal fetal anomalies? Witt Decl. ¶ 23. These questions reflect only a fraction of the varied academic speech that might fall under the statute's purview, and the NPFAA provides no answers. Nor do objective answers even exist—some students may be persuaded by Thomson's *A Defense of Abortion*, such that assigning the article could "promote" abortion, while others may not. And that same vagueness applies to professors' research and publication endeavors, including those of Plaintiffs. It is unclear, for example, whether pursuing scholarship on the idea that women seeking abortions have a right to decline information about continuing their pregnancies, Johnson Decl. ¶¶ 25–27; sharing with colleagues and students an article on the impact of the criminalization of abortion on the teaching of social work, Witt Decl. ¶¶ 26–29; or publicizing scholarship on how obstetric care tends to prioritize the health of the fetus over the health of the mother, UI Fed'n Decl. ¶ 29, might qualify as promoting or counseling in favor of abortion. At bottom, the law is contingent on subjective interpretations as to what content, ideas, and theories might further,

advance, or recommend abortion. Such vagueness is untenable in the context of a criminal prohibition on protected speech.

Finally, the NPFAA lacks any definitions or exemptions that would constrain its vague prohibitions. As noted above, neither the term "promote" nor the term "counsel in favor of" is defined in the statute, and the statute includes no carve-outs of any kind. By contrast, in *First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017), the Ninth Circuit upheld a city ordinance prohibiting "untrue and misleading" advertising against a vagueness challenge where the ordinance made clear "what [was] not regulated" by disavowing any intent to limit "the right of individuals to express and promote" their beliefs about abortion or of limited services pregnancy centers to "counsel against abortions." *Id.* at 1273, 1275 (quoting S.F. Admin. Code § 93.2); *see also Tingley v. Ferguson*, 47 F.4th 1055, 1090 (9th Cir. 2022) (rejecting vagueness argument where statute "effectively provide[d] a checklist of practices for 'inclusion and exclusion'" through specific definitions (citation omitted)). The NPFAA lacks any comparable safeguards.

Nor have prosecutors or any other state actor provided guidance that might mitigate the statute's vagueness. To the contrary, when Plaintiffs' counsel sought assurances from County Prosecuting Attorney Defendants that the NPFAA would not be enforced against professors for their academic speech, they received no response. *See* Kim Decl. Exs. 5–7; *cf. Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 948 (9th Cir. 1983) (emphasizing Attorney General advisory opinion in rejecting vagueness challenge). And the only guidance that has been issued— by public universities that do not enforce the law—underscores the degree of confusion regarding the bounds of the law. For example, UI has stated that Idaho abortion laws are "complex, unclear and written to be punitive for state employees," Kim Decl. Ex. 2 at 1, and cautioned professors about their classroom speech, emphasizing that the "language of the [NPFAA] is vague in many

respects which creates uncertainty as to the extent of the law," Kim Decl. Ex. 3 at 2. And BSU's guidance did little more than restate the NPFAA's own inscrutable standard—telling faculty that their curriculum could include "general information and educational materials that discuss abortion," but only "so long as [the material] does not engage in prohibited activity," such as promoting abortion, "in so doing." Kim Decl. Ex. 4 at 2. These statements confirm that even sophisticated institutions and their lawyers have struggled to interpret the bounds of the law and cannot provide any meaningful clarity on its application.

The NPFAA's vague prohibitions on promoting and counseling in favor of abortion are therefore unconstitutional, and they will continue to chill vast swaths of protected speech, on pain of criminal penalty, unless this Court intervenes.

## II.    Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm

Without injunctive relief, Plaintiffs will suffer irreparable harm from the NPFAA's unconstitutional restriction on their speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (citation omitted); *see also Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009). For that reason, "[a] 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief.'" *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted); *see also Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019).

The NPFAA's chilling effect on Plaintiffs' speech is likewise irreparable harm that requires "immediate injunctive relief without further delay." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (citation omitted). Plaintiffs previously taught content that could be construed as promoting or counseling in favor of abortion, and each planned to continue doing so. But Plaintiffs have now altered their courses to omit material, lectures, and class discussion, and have changed

their feedback and grading of student research and writing assignments, out of fear that the NPFAA criminalizes their speech. *See supra* 4–6 & nn.1–5. Even where professors have chosen to retain certain materials, discussions, or assignments on abortion, they teach with the fear that they will be criminally prosecuted for fulfilling their academic duties.[13] *Cf. N.J. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13–14 (1996). Plaintiffs have also avoided pursuing further scholarship or publicizing their scholarship related to abortion for fear of prosecution. *See supra* 6. The Union Plaintiffs' members have suffered these same harms, while the Union Plaintiffs themselves have been forced to divert resources to address members' fear of prosecution.[14]

These injuries will continue absent preliminary injunctive relief.[15] And once Plaintiffs lose the opportunity to teach important abortion-related material to a particular class of students—such as those in the approaching fall semester—that opportunity is forever lost.[16] Such irreparable harm warrants prompt relief.

## III.   The Balance of Equities and Public Interest Favor an Injunction

Both the balance of equities and the public interest weigh strongly in favor of preliminary injunctive relief. In the context of First Amendment claims, a likelihood of success on the merits "compels a finding that . . . the balance of the hardships tips sharply in Plaintiff[s'] favor." *Am. Beverage Ass'n*, 916 F.3d at 758 (citation omitted); *Doe v. Harris*, 772 F.3d at 583 (heightened where, as here, a law imposes criminal penalties). Similarly, the Ninth Circuit has "consistently

---

[13] *See* Turpin Decl. ¶¶ 13, 30; Blevins Decl. ¶¶ 15–16; State Fed'n Decl. ¶¶ 28–30, 41, 43.

[14] *See* UI Fed'n Decl. ¶¶ 16–29, 30–32; State Fed'n Decl. ¶¶ 19–23, 25, 27, 31, 33–40, 42, 44–47.

[15] *See* Quinn Decl. ¶ 28; Johnson Decl. ¶¶ 28–29; McBrayer Decl. ¶ 31; Turpin Decl. ¶ 33; Blevins Decl. ¶¶ 35–36; Witt Decl. ¶¶ 32–33; State Fed'n Decl. ¶¶ 27, 35, 40; UI Fed'n Decl. ¶¶ 18, 22, 25, 29.

[16] *See* Johnson Decl. ¶ 15; McBrayer Decl. ¶¶ 17, 26; State Fed'n Decl. ¶ 26.

recognized the significant public interest in upholding First Amendment principles." *Am. Beverage Ass'n*, 916 F.3d at 758.

The balance of equities tips sharply in Plaintiffs' favor because, absent injunctive relief, the NPFAA will continue to unjustifiably chill speech and subject individuals exercising their First Amendment rights to the threat of criminal prosecution. *See supra* 4–6. By contrast, the government will not be burdened by a preliminary injunction because the injunction would "merely end[] an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And, to the extent the government asserts an interest in effectuating its legal prohibitions on abortion, or any associated public interest in those prohibitions, it cannot demonstrate that those interests would be harmed by a preliminary injunction. Whatever interests the government may assert, those interests cannot justify suppressing public debate about the wisdom or morality of the government's actions. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."). Finally, ensuring that Idaho's public university professors, including Plaintiffs, are able to provide a complete and robust education also serves the public interest. "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth." *Sweezy*, 354 U.S. at 250. The NPFAA, which has already curtailed Plaintiffs' ability to carry out those vital responsibilities, runs directly counter to that public interest.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

Dated: August 8, 2023

Respectfully submitted,

/s/ *Erika Birch*
Erika Birch (ISB No. 7831)
Strindberg Scholnick Birch
    Hallam Harstad Thorne
American Civil Liberties Union of
    Idaho Foundation Cooperating Attorney
1516 W Hays St.
Boise, Idaho 83702
Tel: (208) 336-1788
erika@idahojobjustice.com

Samir Deger-Sen*
Peter Trombly*†
Margaret Babad*
Emily True*
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
samir.deger-sen@lw.com
peter.trombly@lw.com
molly.babad@lw.com
emily.true@lw.com

Scarlet Kim*
Andrew Beck*
Elizabeth Gyori*
American Civil Liberties
    Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2633
Fax: (212) 549-2649
scarletk@aclu.org
abeck@aclu.org
egyori@aclu.org

Danielle Conley*
Margaret A. Upshaw*
Cherish A. Drain*
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: (202) 637-2200
Fax: (202) 637-2201
danielle.conley@lw.com
maggie.upshaw@lw.com
cherish.drain@lw.com

Dina Flores-Brewer (ISB No. 6141)
American Civil Liberties Union of
    Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

Marissa Marandola*
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Tel: (617) 948-6000
Fax: (617) 948-6001
marissa.marandola@lw.com

Seth Kreimer*
3501 Sansom Street
Philadelphia, PA
skreimer@law.upenn.edu

Amanda Barnett*
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: (213) 485-1234
Fax: (213) 891-8763
amanda.barnett@lw.com

*\* Pro hac vice applications forthcoming*

*†Admitted to practice in Virginia only*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 8, 2023, I filed the foregoing Motion for Preliminary Injunction electronically though the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Not Applicable (no defendant has yet appeared)

And I FURTHER CERTIFY that on such date I caused the foregoing, along with all attendant Declarations and Exhibits, to be served on the following non-CM/ECF registered participants *via* Electronic mail with a hard copy to follow via U.S. first class mail, postage prepaid addressed as follows:Raúl R. Labrador

Office of the Attorney General State
of Idaho
700 W. Jefferson St.
P.O. Box 83720
Boise, ID 83720-0010
aglabrador@ag.idaho.gov

Stephen F. Herzog
Bannock County Prosecuting
Attorney
624 E Center St, Room 204
Pocatello, ID 83201
sherzog@bannockcounty.us

Jan M. Bennetts
Ada County Prosecuting Attorney
Adan County Prosecutor's Office
200 West Front Street, Room 3191
Boise, ID 83702
jbennetts@adacounty.id.gov

Bill Thompson
Latah County Prosecuting Attorney
Latah County Courthouse
522 S Adams Street, Room 211
Moscow, ID 83843
bthompson@latah.id.us
paservice@latahcountyid.gov

*/s/ Erika Birch*
Erika Birch (ISB No. 7831)