

# STATE OF IDAHO
### OFFICE OF THE ATTORNEY GENERAL
### RAÚL R. LABRADOR

## ATTORNEY GENERAL OPINION NO. 23-04

TO:    The Honorable Judy Boyle
Idaho House of Representatives
P.O. Box 83720
Boise, ID 83720-0038

You have requested an opinion from the Attorney General on how the prohibitions on promoting or counseling in favor of abortion in the No Public Funds for Abortion Act, Chapter 87, Title 18, Idaho Code, apply to professors and other educators employed by Idaho's public universities and community colleges. Your request raises an important question on the application of Idaho law, and therefore this opinion is published as an official opinion of the Idaho Office of the Attorney General.

### QUESTION PRESENTED

Does the language in the No Public Funds for Abortion Act prohibiting the use of public funds to "promote" or "counsel in favor" of abortion prohibit employees of public institutions of higher education from speaking on abortion within the context of academic teaching and scholarship if their speech could be viewed as supporting abortion?

### CONCLUSION

No. The No Public Funds for Abortion Act comprehensively prohibits the use of public funds to, among other things, "provide, perform, or induce an abortion; assist in the provision or performance of an abortion; promote abortion; counsel in favor of abortion; refer for abortion; or provide facilities for an abortion or for training to provide or perform an abortion." However, under a plain language interpretation of the Act applying appropriate canons of statutory construction, the Act does not prohibit university employees from speaking on abortion in their academic teaching or scholarship, even if that teaching or scholarship could be viewed as supporting abortion or abortion rights in general.

EXHIBIT A

## ANALYSIS

In 2021, the State of Idaho enacted the "No Public Funds for Abortion Act." *See* Idaho Code § 18-8701. Among other things, the Act prohibits the use of public funds "in any way to provide, perform, or induce an abortion; assist in the provision or performance of an abortion; promote abortion; counsel in favor of abortion; refer for abortion; or provide facilities for an abortion or for training to provide or perform an abortion." Idaho Code § 18-8705(1). It also prohibits the use of any "part of any tuition or fees paid to a public institution of higher education ... to pay for an abortion, provide or perform an abortion, provide counseling in favor of abortion, make a referral for abortion, or provide facilities for an abortion or for training to provide or perform abortion." Idaho Code § 18-8706. An intentional violation of the act by a public officer or public employee "shall be considered a misuse of public moneys punishable under section 18-5702, Idaho Code." Idaho Code § 18-8709.

This opinion is intended to clarify the scope of the Act as it relates to academic teaching and scholarship conducted by the employees of Idaho's public institutions of higher education. These important questions concerning academic freedom and the free speech rights of public university professors are frequently litigated from all sides of the political spectrum.[1]

### I.  First Amendment Interpretation Framework.

#### A.  The Presumption of Constitutionality.

Interpretation of the Act is guided by well-established canons of statutory interpretation relating to the constitutionality of a statute. First, "[i]t is generally presumed that legislative acts are constitutional, that the state legislature acted within its constitutional powers, and any doubt concerning interpretation of a statute is to be resolved in favor of that which will render the statute constitutional." *Olsen*

---

[1] *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021) (holding that the university violated a professor's free-speech rights when it disciplined him for refusing to use a student's preferred pronouns); *NCF Freedom, Inc. v. Diaz*, No. 4:23-cv-00360-MW-MAF (N.D. Fla. 2023) (complaint alleging that Florida's SB 266, which, according to the complaint, "outlaws college courses thought to advance 'political or social activism' and other disfavored concepts and prohibits the expenditure of funds associated with any program promoting 'diversity, inclusion and equity,'" violates academic freedom); *Jackson v. Wright*, No. 4:21-CV-00033, 2022 WL 179277 (E.D. Texas 2022) (ruling on a motion to dismiss in which a university professor alleged that he was disciplined, in violation of the First Amendment, for his academic writings and scholarship relating to a racially charged dispute about certain musical theorists); *De Piero v. Penn. St. Univ.*, No. 2:23-cv-02281 (E.D. Pa. 2023) (complaint alleging constructive termination in violation of university professor's First Amendment rights based on the university professor's disagreement with "antiracist" training); *Reges v. Cauce*, 2:22-cv-0964 (W.D. Wash 2023) (complaint alleging First Amendment violation due to disciplinary action against professor for refusing to include university land acknowledgement on class syllabus and including his own views on the subject on the syllabus).

*v. J.A. Freeman Co.*, 117 Idaho 706, 709, 791 P.2d 1285, 1288 (1990) (citations omitted). "Whenever possible, a statute should be construed so as to avoid a conflict with the state or federal constitution." *State v. Gomez-Alas*, 167 Idaho 857, 866, 477 P.3d 911, 920 (2020) (brackets and citation omitted). Thus, "[w]hen possible, the Court is obligated to seek an interpretation of a statute that upholds its constitutionality." *Planned Parenthood Great Nw. v. Idaho*, 171 Idaho 374, 397, 522 P.3d 1132, 1155 (2022) (cleaned up). "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (cleaned up). In interpreting statutes, one "must construe statutes under the assumption that the legislature knew of all legal precedent and other statutes in existence at the time the statute was passed." *Twin Lakes Canal Co. v. Choules*, 151 Idaho 214, 218, 254 P.3d 1210, 1214 (2011) (cleaned up). Finally, a statute should be given "an interpretation that will not render it a nullity." *Id.* (citations omitted).

### B. Binding Precedent Allows Government to Limit Funding of Promotion of Abortion.

The U.S. Supreme Court has specifically addressed the question of whether the government may, under the First Amendment, prohibit the use of government funds to "engag[e] in activities that encourage, promote or advocate abortion as a method of family planning." *Rust v. Sullivan*, 500 U.S. 173, 180 (1991) (cleaned up). The Court held that "[t]here is no question but that the ... prohibition ... is constitutional." *Id.* at 192. This is because "the government may make a value judgment favoring childbirth over abortion and implement that judgment by the allocation of public funds." *Id.* at 192–93 (internal quotations, ellipses, and citation omitted). These restrictions can also be imposed upon employees who are voluntarily employed, since the "employees remain free ... to pursue abortion-related activities" when they are not using the government funds and the prohibitions in question "do not in any way restrict the activities of those persons acting as private individuals." *Id.* at 198–99.

*Rust*'s holding is even more notable because it was decided when the U.S. Supreme Court's precedent erroneously recognized a federal constitutional right to abortion. Now that the Supreme Court has correctly held that the U.S. Constitution does not provide a right to abortion, *see Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228, 2242 (2022), and Idaho has criminalized abortion in most circumstances, *see* Idaho Code § 18-622, this reasoning is even stronger. And there is no question that the State of Idaho may constitutionally prohibit the use of public funds to perform a criminal act, or to incite, solicit, or agree to assist a criminal act. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (incitement); *Brown v. Hartlage*, 456 U.S. 45, 55 (1982).

Representative Judy Boyle
September 15, 2023
Page 4

### C. Binding Precedent Protects Speech by University Employees on Matters of Public Concern in Teaching or Scholarship.

At the same time that the First Amendment permits the government to limit the use of public funds in support of abortion, there is also a long line of cases from the U.S. Supreme Court and the U.S. Courts of Appeals interpreting the First Amendment protection of speech uttered by public employees. One of the earliest is *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968). In that case, the Court stated that even though public employees cannot be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest" as a condition of working for a government employer. *Id.* at 568. However, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* Thus, in analyzing the free speech claims of public employees, the "problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

More recently, the U.S. Supreme Court, in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), addressed the question of "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." *Id.* at 413. The Court answered this question in the negative and held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

However, *Garcetti* also noted that "[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* at 425. Indeed, the U.S. Supreme Court has stated that "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). "That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* Thus, the majority in *Garcetti* determined that "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 547 U.S. at 425. Similarly, the Court in *Rust* observed that "the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control

speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." *Rust*, 500 U.S. at 200.

While the U.S. Supreme Court has not yet decided whether the *Garcetti* analysis "would apply in the same manner to a case involving speech related to scholarship or teaching," *Garcetti*, 547 U.S. at 425, the issue has been addressed by several courts of appeals, including the Ninth Circuit. In *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), the court held that "*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed pursuant to the official duties of a teacher and professor." *Id.* at 412 (internal quotations omitted).

Similarly, courts in the Fourth, Fifth, and Sixth circuits, in addition to the Ninth Circuit, have held that *Garcetti* does not apply to professors at public universities while engaging in teaching and scholarship. *See Meriwether*, 992 F.3d at 512 (compiling cases to support its holding that public universities "cannot force professors to avoid controversial viewpoints altogether in deference to a state-mandated orthodoxy" and concluding that the university violated a professor's free-speech rights when it disciplined him for refusing to use a student's preferred pronouns). Helping students think critically is a core value of public universities, and the "need for the free exchange of ideas in the college classroom is unlike that in other public workplace settings." *Id.* at 507. "The Nation's future depends upon leaders trained through wide exposure to [the] robust exchange of ideas." *Keyishian*, 385 U.S. at 603. "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.* (quoting *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250 (1957)).

Thus, "academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*." *Demers*, 746 F.3d at 412. Under the two-part *Pickering* balancing test, the employee must first "show that his or her speech addressed matters of public concern." *Id.* (internal quotations omitted). "Second, the employee's interest in commenting upon matters of public concern must outweigh the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (internal quotations omitted).

In applying this two-part *Pickering* balancing test to the question presented, there can be no doubt that speech related to abortion does address matters of public concern. In balancing that against the State's interest in promoting the efficiency of

Representative Judy Boyle
September 15, 2023
Page 6

the public services it performs through its employees, it is important to note that this issue deals with a relatively small subset of public employees—only those employees of public institutions of higher education engaging in academic scholarship and teaching. The interest of this small subset of employees, however, has what the U.S. Supreme Court has declared to be a "special concern of the First Amendment." *Keyishian*, 385 U.S. at 603. This interest is of such vital importance that "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Id.* (internal quotations and parentheses omitted).

On the other hand, the State also has a vitally important interest in that it is entitled to make certain value judgments and to implement that value judgment through the allocation of public funds. *See Rust*, 500 U.S. at 192–93. Further, the State, as set forth in Idaho's statutes, has a "'profound interest' in preserving the life of preborn children," and has declared it to be the policy of the State that "all state statutes, rules and constitutional provisions shall be interpreted to prefer, by all legal means, live childbirth over abortion." Idaho Code § 18-601; *see also Dobbs*, 142 S.Ct. at 2284 (2022) (describing a state's interest in prohibiting abortion as including, among other things, a "respect for and preservation of prenatal life at all stages of development," "the protection of maternal health and safety," and "the mitigation of fetal pain").

In the same way that a public university cannot discipline a professor for failing to comply with the university's preferred pronoun policy in the professor's classroom, *see Meriwether*, 992 F.3d at 511, the balancing test would likely make it unconstitutional for a state to prohibit professors from discussing abortion in the classroom or engaging in academic scholarship relating to abortion, even if some of that teaching and scholarship could be viewed as supporting abortion. If the Act were construed to prohibit that speech, the prohibition would likely be unconstitutional. Nevertheless, as discussed below, that issue is not reached because the plain language of the Act does not prohibit speech related to abortion in the context of academic teaching and scholarship. Thus, it is unnecessary to reach any final resolution of the *Pickering* balancing test in this context.

## II. The Act Does Not Prohibit Public University Employees from Engaging in Speech in Academic Teaching or Scholarship Which Could Be Viewed as Supporting Abortion in General.

When engaging in statutory interpretation, the objective "is to derive the intent of the legislative body that adopted the act." *Estate of Stahl v. Idaho State Tax Comm'n*, 162 Idaho 558, 562, 401 P.3d 136, 140 (2017). As the Idaho Supreme Court has explained,

> [s]tatutory interpretation ... begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*Id.* (quoting *State v. Schulz*, 151 Idaho 863, 866, 264 P.3d, 970, 973 (2011)). In addition, it must be presumed that the legislature was aware of all applicable legal precedent existing at the time the statute was passed, including the legal precedent relating to academic speech discussed above. *Twin Lakes Canal Co.*, 151 Idaho at 218, 254 P.3d at 1214.

The plain text of the Act does not prohibit public university employees from engaging in speech relating to academic teaching and scholarship that could be viewed as supporting abortion. The Act prohibits the use of public funds to "promote abortion" and to "counsel in favor of abortion." The plain meaning of these terms do not prohibit professors from speaking on abortion in their teaching and scholarship, even if that teaching or scholarship could be viewed as supporting abortion.

### 1. Interpreting "counsel in favor of."

"Counsel" is defined, in part, as "advice, esp. that given formally." *Counsel*, THE NEW OXFORD AMERICAN DICTIONARY (2001). In the context of the Act, which is designed to prohibit the use of public funds for abortion, the plain meaning of the term "counsel" must refer to the counsel or advice one person gives to another person asking for advice or help with a specific situation. Academic teaching about abortion, discussing the arguments some have advanced in favor of abortion within the academic environment, and conducting academic scholarship relating to abortion

would not be impacted by the term "counsel in favor of abortion," since those activities do not relate to counseling a specific person in a specific circumstance in favor of abortion. Thus, a professor might violate the Act by advising a specific student during office hours to obtain an abortion, but would not violate the Act by discussing abortion in a favorable manner in class or in scholarship.

### 2. Interpreting "promote."

The term "promote" sometimes has a more generalized meaning than "counsel," being defined as "further the progress of (something, esp. a cause, venture, or aim); support or actively encourage." *Promote*, THE NEW OXFORD AMERICAN DICTIONARY 1364 (2001). However, within statutory law, "promote" has also been interpreted with a meaning similar to the meaning of "counsel" discussed above. In *U.S. v. Williams*, 553 U.S. 285, 300 (2008), the U.S. Supreme Court held that the term "promotes," in a statute criminalizing the pandering of child pornography, "does not refer to abstract advocacy, such as the statement 'I believe that child pornography should be legal' or even 'I encourage you to obtain child pornography.'" Rather, the term "refers to the recommendation of a particular piece of purported child pornography with the intent of initiating a transfer." *Id*. The court held that the statute which, among other things, prohibited the promotion of child pornography, "falls well within constitutional bounds." *Id*. at 299.

The use of "promote" in the Act should be interpreted in the same manner as the U.S. Supreme Court did in *Williams*. Just as the term "promote," as used in the federal statute prohibiting the pandering of child pornography does not "refer to abstract advocacy," the term "promote" in the Act also does not refer to the abstract teaching and scholarship of abortion conducted by university professors. Rather, teaching and scholarship are critical to fulfill the ideals set forth in the above cited cases. These ideals—helping to train our Nation's future leaders, encouraging the robust exchange of ideas, helping students to learn how to think critically—are not inhibited by the Act. Rather, what is prohibited is contribution, on State time and money, to efforts to facilitate abortions. The most reasonable construction of the Act according to its plain language and the presumption of constitutionality is that it does not penalize the critical discussion of, or even favorable coverage of, abortion within the context of academic teaching and scholarship.

### 3. Application of the Act.

Based on this plain language interpretation, the Act does not prohibit any academic discussion in favor of abortion. While it is impossible to list every possible act that may be permissible, or that may run afoul of the Act, as examples only, a literature professor could assign students to read in class essays or literature discussing, or even advocating for, abortion without fear of violating the Act. An

ethics professor could discuss abortion, and assign students to research topics of abortion, within a medical ethics course without fear of violating the act. A law school professor could teach about *Roe v. Wade*, *Dobbs*, and how states have regulated, or not regulated, abortion in the aftermath of *Dobbs*, and could even advocate that *Roe* was right and *Dobbs* is wrong, and that the State of Idaho's laws regarding abortion should be changed, without fear of violating the Act.[2] Professors can conduct academic scholarship, including research and writing, about abortion, even if that research or writing supports abortion, without fear of violating the Act.

The plain meaning of the phrases "promote abortion" and "counsel in favor of abortion" do not prohibit speech about abortion in the context of academic teaching and scholarship conducted by the employees of public institutions of higher education engaged in academic teaching and scholarship, even if that teaching or scholarship could be viewed as supporting abortion. However, official activities by public university employees which do not constitute academic teaching or scholarship would be prohibited by the Act. As an example only, a professor or other university employee could not, during office hours, counsel a specific student to abort her baby, or refer that student to an abortionist in order to abort her baby. And a professor could not, as part of her academic research or teaching responsibilities, use public funds to participate in or assist with an abortion in another state.

Nor do university professors have *carte blanche* authority to do whatever they want relating to abortion in the context of their teaching and scholarship. For example, Idaho Code § 39-9306(3) prohibits the use of "an unborn infant or the bodily remains or embryonic stem cells of an aborted infant in animal or human research, experimentation or study, or for transplantation." That statutory prohibition is unrelated to the speech or expressive conduct of university employees and is thus unaffected by this interpretation of the Act. And the other prohibitions in the Act not addressed above forbid the use public funds to provide abortions, induce abortions, provide facilities for abortions or training to provide or perform an abortion, counsel a specific person to obtain an abortion, or to refer a specific person for abortion.

Finally, this opinion addresses only how the Act affects the academic speech of employees of public institutions of higher education relating to teaching or scholarship. It does not relate to speech by employees of public higher education institutions that is not related to teaching or scholarship, or to teaching or scholarship that is not speech or expressive conduct. Nor does this opinion apply to teachers at public primary and secondary schools since the same academic freedom analysis may not apply to primary and secondary school teachers. *See, e.g., Demers*, 746 F.3d at

---

[2] While it should go without saying, just as a professor could talk about his or her position on abortion as part of a relevant class discussion, students in the class would be equally free under the First Amendment to express their opinions on abortion, even if their opinions are opposed to the professor's opinions, without facing adverse consequences from the professor (such as a lower grade).

413 ("[T]he degree of freedom an instructor should have in choosing what and how to teach will vary depending on whether the instructor is a high school teacher or a university professor."); *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 334 (6th Cir. 2010) (holding that the "right to free speech protected by the First Amendment does not extend to the in-class curricular speech of teachers in primary and secondary schools made 'pursuant to' their official duties.").

## CONCLUSION

For the reasons above, I conclude that the plain meaning of the No Public Funds for Abortion Act does not prohibit employees of institutions of higher education from engaging in abortion related speech as part of their academic teaching or scholarship, even if that teaching or scholarship could be viewed as supporting abortion. Although the prosecutorial authority of this office is limited and triggered only upon referral by a county prosecutor, *see* Formal Opinion 23-1, this office would not bring any referred prosecution under the Act inconsistent with the interpretation set forth herein.

## AUTHORITIES CONSIDERED

1. **Idaho Code:**

    § 18-8701
    § 18-8705
    § 18-8706
    § 18-8709
    § 18-622
    § 18-601
    § 39-9306

2. **Idaho Cases:**

    *Estate of Stahl v. Idaho State Tax Comm'n*, 162 Idaho 558, 401 P.3d 136 (2017)
    *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 791 P.2d 1285 (1990)
    *Planned Parenthood Great Nw. v. Idaho*, 171 Idaho 374, 522 P.3d 1132 (2022)
    *State v. Gomez-Alas*, 167 Idaho 857, 477 P.3d 911 (2020)
    *State v. Schulz*, 151 Idaho 863, 264 P.3d, 970 (2011)
    *Twin Lakes Canal Co. v. Choules*, 151 Idaho 214, 254 P.3d 1210 (2011)

3. **Other Authorities:**

    *Brandenburg v. Ohio*, 395 U.S. 444 (1969)
    *Brown v. Hartlage*, 456 U.S. 45 (1982)

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)
*De Piero v. Penn. St. Univ.*, No. 2:23-cv-02281 (E.D. Pa. 2023)
*Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022)
*Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010)
*Garcetti v. Ceballos*, 547 U.S. 410 (2006)
*INS v. St. Cyr*, 533 U.S. 289 (2001)
*Jackson v. Wright*, No. 4:21-CV-00033, 2022 WL 179277 (E.D. Texas 2022)
*Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589 (1967)
*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)
*NCF Freedom, Inc. v. Diaz*, No. 4:23-cv-00360-MW-MAF (N.D. Fla. 2023)
NEW OXFORD AMERICAN DICTIONARY (2001)
*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968)
*Reges v. Cauce*, No. 2:22-cv-0964 (W.D. Wash 2023)
*Rust v. Sullivan*, 500 U.S. 173 (1991)
*Sweezy v. State of New Hampshire*, 354 U.S. 234 (1957)
*U.S. v. Williams*, 553 U.S. 285 (2008)

Dated this 15th day of September, 2023.



RAÚL R. LABRADOR
Attorney General

**Analysis By:**

Lincoln Davis Wilson
*Division Chief, Civil Litigation and Constitutional Defense*