UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO FEDERATION OF TEACHERS, et al.,<br><br>         Plaintiffs,<br><br>v.<br><br>RAUL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.,<br><br>         Defendants. | Case No. 1:23-cv-00353-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiffs' Motion for Preliminary Injunction. Dkt. 2. Additionally, Defendants have filed two motions to dismiss. Dkts. 38, 43.[1] On April 9, 2024, the Court held oral argument and took all motions under advisement.

Upon review, and for the reasons set forth below, the Court DENIES Bennetts' Motion to Dismiss, DENIES Plaintiffs' Motion for Preliminary Injunction, and GRANTS Defendants' Motion to Dismiss.

## II. OVERVIEW

This case presents an interesting and important legal question: what parameters, if

---

[1] Defendants Idaho Attorney General Raul Labrador, Stephen Herzog, and Bill Thompson are represented by the same counsel. Defendant Jan Bennetts, however, has separate counsel. For ease of reference, the Court will refer to Defendant Bennetts as "Bennetts" and the remaining Defendants as "Defendants."

any, can the government place on the speech of its employees in the public sphere?

But before arriving at that question, the Court must answer a difficult procedural question: can the Plaintiffs show a likelihood of success on their claims—even preliminarily—when the enforcing-authority Defendant has affirmatively stated it *will not* take any action against the Plaintiffs in the first instance?

In this case, the state of Idaho enacted legislation intended to curtail abortion-related speech by those who receive state funding. But it curtailed perspectives on only one side of the abortion debate: those in favor of abortion. Plaintiffs allege this is a violation of their First Amendment right to free speech. They proffer examples of ways in which their conduct may violate the statute and, as a result, subject them to punishment. But the problem the Court faces is that the primary Defendant tasked with enforcement of the statute has *specifically and emphatically* stated it will not punish *these* Plaintiffs for the speech which they allege is at issue. The question becomes then: is this even a case at all?

Candidly, the Court has concerns about the statute. It is not a beacon of clarity and may invite further litigation down the road. The Court is also not entirely convinced that the Idaho Attorney General's interpretation of the statute is accurate. That said, because the Office of the Attorney General—and by extension county prosecutors—is the entity that would prosecute any violations, its interpretation cannot be ignored. And if it will not prosecute these plaintiffs for the speech of which they complain in this case, what would the Court rule on today? Without a live case or controversy to adjudicate, the Court must stay in its lane and dismiss this suit.

This ruling is, therefore, *not* a ruling on whether the State of Idaho's statute

regulating abortion-related speech by governmental employees is constitutional or unconstitutional. It is a procedural ruling about whether and when a case presents a justiciable issue.

### III. BACKGROUND

#### A. The Parties

Plaintiffs are individual university professors and teachers' unions with faculty members across the state of Idaho. Each of these individuals claim that, in some fashion or another, they discuss abortion across their various disciplines. Plaintiffs collectively bring this suit to challenge Idaho's criminal prohibition on any speech by a public employee that supports abortion.

Defendant Raul Labrador ("AG Labrador") is the Attorney General of the State of Idaho. AG Labrador's office oversees enforcement of all Idaho criminal statutes. Defendants Jan Bennetts, Stephen Herzog, and Bill Thompson are the Prosecuting Attorneys in Ada, Bannock, and Latah Counties respectively. Idaho's three largest state-owned universities are located in these counties and the prosecuting attorneys have the primary responsibility of enforcing criminal statutes under the guidance of AG Labrador.

#### B. The No Public Funds for Abortion Act

During the 2021 legislative session, the No Public Funds for Abortion Act ("NPFAA") was signed into law. As relevant here, the NPFAA provides:

> No public funds . . . shall be used in any way to provide, perform, or induce an abortion; assist in the provision or performance of an abortion; promote abortion; counsel in favor of abortion; refer for abortion; or provide facilities for an abortion or for training to provide or perform an abortion.

MEMORANDUM DECISION AND ORDER – 3

Idaho Code § 18-8705(1). The NPFAA also provides that "[n]o person" who "receives [public] funds . . . may use those funds to . . . promote abortion . . . ." § 18-8705(2). The NPFAA imposes criminal penalties for violations of the statute, with public employees subject to misdemeanor or felony liability, imprisonment for up to fourteen years, and fines of up to $10,000. *Id*. §§ 18-8709, 18-5702.

Following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), several of Idaho's public universities attempted to issue guidance on the NPFAA's application to academic speech that relates to abortion. Generally speaking, these universities' Offices of General Counsel advised professors that the NPFAA was vague, complex, and confusing. Many cautioned their professors that, to avoid criminal penalties, it would be best if all discussions regarding abortion were done in general terms without appearing to promote abortion.

As a result of the NPFAA (and the afore-mentioned legal guidance), Plaintiffs claim they have altered the way in which they discuss abortion in the classroom and how they engage in academic scholarship related to abortion-adjacent topics. They claim the NPFAA's parameters are an impermissible restriction on their academic speech.

### C. Procedural History and Defendant Labrador's Letter

On August 8, 2023, Plaintiffs filed the instant lawsuit (Dkt. 1) and Motion for Preliminary Injunction (Dkt. 2). In their suit, Plaintiffs bring two causes of action. First, Plaintiffs allege the NPFAA violates the First Amendment by prohibiting them from expressing a particular viewpoint. Second, Plaintiffs allege the NPFAA is unconstitutionally vague under the Fourteenth Amendment.

MEMORANDUM DECISION AND ORDER – 4

Thereafter, the parties engaged in informal discussions in the hopes of resolving this case without further motion practice. The Court granted numerous extensions so the parties could negotiate a resolution. *See, e.g.,* Dkts. 26, 31, 34, 36.

On September 15, 2023, AG Labrador issued an opinion letter (the "Opinion")—titled Attorney General Opinion No. 23-04—in response to an inquiry from a member of the Idaho House of Representatives who requested clarification regarding how the NPFAA applies to professors and educators in Idaho. Dkt. 43-3. The Opinion is nine and a half pages of text followed by one page of citations. The Opinion will be discussed in detail below, but the essence of AG Labrador's guidance is that *academic* speech regarding abortion—even speech that is favorable to abortion—does not fall under the NPFAA and will not be prosecuted.

On October 26, 2023, Defendant Jan Bennetts filed a Motion to Dismiss. Dkt. 38. Therein, Bennetts alleges she should be dismissed from this suit because Plaintiffs do not have standing to bring a pre-enforcement challenge of a state statute against her (a county official).

On November 2, 2023, the remaining Defendants filed a combined opposition to Plaintiffs' Motion for Preliminary Injunction and a Motion to Dismiss. Dkts. 42, 43.

The Court granted various extensions to the briefing schedule. Dkts. 47, 49.

In due course, Plaintiffs responded to Bennetts' Motion to Dismiss (Dkt. 50) and to Defendants' Motion to Dismiss (Dkt. 52). Bennetts and Defendants replied (Dkts. 51, 53).

On April 9, 2024, the Court held oral argument on all pending motions and took the matters under advisement. It now issues the following decision.

## IV. LEGAL STANDARD

### A.  Preliminary Injunction

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

### B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted[.]" "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (cleaned up). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). "This is not an onerous burden." *Johnson*, 534 F.3d at 1122.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements[.]" *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to

relief that is plausible on its face." *Id.* at 570.

In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations made in the pleading under attack. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly*, the Ninth Circuit has continued to adhere to the rule that a dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See, e.g., Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

## V. DISCUSSION

As noted, Bennetts' Motion to Dismiss is directed at certain procedural aspects of Plaintiffs' case such as standing. While the remaining Defendants also discuss standing, they delve more fully into the substance of the law and whether Plaintiffs can show a likelihood of success on their First and Fourteenth Amendment claims. For these reasons the Court will analyze the motions separately.[2]

### A.  Bennetts' Motion to Dismiss (Dkt. 38)

Bennetts raises two primary concerns in her Motion to Dismiss. First, she alleges Plaintiffs lack standing to bring a pre-enforcement suit against her especially when she has not threatened to prosecute them. Second, she alleges Plaintiffs have not actually brought

---

[2] And to be sure, Bennetts also discusses the merits of Plaintiffs' claims. For organizational purposes, however, the Court will discuss the motions separately.

any claims against her personally and thus, have failed to state a plausible cause of action.

It should be noted that, while the Opinion had been published by the time Bennetts filed her motion, she does not rely on it. So again, while it may seem unnecessary for the Court to analyze Bennetts' arguments separately from the other Defendants, it does so because her arguments are slightly different and rely on other theories.

### 1. Standing

Within her standing argument, Bennetts puts forth various sub-arguments in support. The Court begins with her primary framework.

Federal courts have the constitutional power to adjudicate only genuine "cases" and "controversies" under Article III, § 2; exercising that power requires that litigants have standing. *California v. Texas*, 593 U.S. 659, 668 (2021). To have standing to sue Prosecutor Bennetts, Plaintiffs must satisfy four elements: (1) they must be under threat of suffering an "injury in fact" that is concrete and particularized; (2) the threat must be actual and imminent, not conjectural or hypothetical; (3) it must be fairly traceable to the challenged action of Prosecutor Bennetts; and (4) it must be likely that a favorable judicial decision will prevent or redress the injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Plaintiffs are required to clearly allege facts demonstrating each element of standing to avoid dismissal. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175 (9th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Bennetts alleges Plaintiffs fail at each step of the inquiry.

First, Bennetts contends she has never prosecuted anyone for violating the NPFAA and that Plaintiffs cannot show they are under any immediate threat of harm (elements 1

and 2). Second, Bennetts argues if there is a harm, it is traceable to the statute itself, not anything she may or may not do (element 3). Finally, Bennetts asserts that a decision against her will not alleviate Plaintiffs' concerns and, therefore, she is not a necessary party to this case (element 4). The Court will briefly analyze each argument.

a. Actual Injury

Bennetts reasons that, while Plaintiffs claim to have changed their behavior because of the NPFAA, they haven't articulated a clear plan to violate the statute. Dkt. 38-1, at 6–10. This will be discussed in more detail below, but suffice it to say, this is the primary dispute between the parties. The NPFAA mandates that no public funds shall be used in a way that "promote[s] abortion" or "counsel[s] in favor of abortion." Idaho Code § 18-8705(1). Bennetts claims that nothing in Plaintiffs' complaint regarding what they intend to do appears to violate the statute. Again, herein lies a fundamental disagreement between the parties and the definitions of two words in the statue: "counsel" and "promote."

This grammatical disagreement aside, the Court is concerned that Plaintiffs cannot point to anything Bennetts has done that would give them reason to fear they stand in the crosshairs of future prosecution.[3] At some point prior to litigation, Plaintiffs sought assurances from Bennetts (and Herzog and Thompson) that the teaching and speech they intended to engage in would not be punished. None of the three prosecutors responded to the request. Plaintiffs contend this "failure to disavow" shows prospective injury. But this

---

[3] In fact, Plaintiffs cannot point to anything *anyone* has done to enforce the NPFAA against anyone in the state. To the Court's knowledge, there has not been any prosecution of educators at any level under the statute.

puts the burden on the wrong party. It is Plaintiffs' duty to show an actual threat of harm, not Bennetts' duty to show she *will not* inflict harm in the future.

The Court is more persuaded by Bennetts' arguments on this wise. A plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). "[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). Plaintiffs must allege a genuine, credible, specific threat of imminent prosecution by the Ada County Prosecutor's Office and/or Bennetts to establish standing. They have not done so. This factor weighs in favor of dismissing Bennetts from the case.

### b. Traceability

Bennetts next argues Plaintiffs' grievance is with the NPFAA, not her. Dkt. 38-1, at 10–13. Plaintiffs' complaint is rife with examples of how the NPFAA (via the Idaho Legislature) may cause them harm, but they never actual mention Bennetts. They specifically list her as a Defendant (Dkt. 1, at 8) but then simply group her as part of "all Defendants" who are causing them harm (*Id*. at 37, 38). The Court understands Bennetts' argument, but the fact remains that someone has to prosecute violations of state statute. So, to say the statute is causing harm, not Bennetts, is disingenuous. The statute cannot enforce itself. Someone must enforce it.

The Court's bigger concern is that Bennetts is not the only person who could enforce the NPFAA. In fact, she may not even be the primary enforcer. That will likely be done by

MEMORANDUM DECISION AND ORDER – 10

AG Labrador. He has the authority to enforce Idaho statutes. To be sure, the way that AG Labrador does this in the practical sense is via county prosecutors. But if he were to disavow prosecution of a statue (as he has here) it is extremely unlikely that a local county prosecutor would continue prosecution. So, on the one hand, Plaintiffs are correct: Bennetts (and the other named prosecutors) oversee enforcement of the NPFAA. But at the same time, listing them alongside AG Labrador is somewhat duplicative.

Relatedly, it appears Plaintiffs chose these three specific prosecutors because many of the Plaintiffs are from Boise State University, Idaho State University, and the University of Idaho (which are in those prosecutor's counties). That said, *presumably*, professors at other state universities in Idaho fall into the "similarly situated individuals" category outlined in Plaintiffs' complaint and qualify as those for whom Plaintiffs request relief. Dkt. 1, at 38, 39, 40. And yet Plaintiffs did not name the prosecutors of Nez Perce County (where Lewis-Clark State College is located), Bonneville County (where the College of Eastern Idaho is located), Twin Falls County (home to College of Southern Idaho), Canyon County (where College of Western Idaho is located), or Kootenai County (home to North Idaho College) as Defendants. The Court finds this troubling.

Despite its concerns, however, the Court is ultimately not persuaded by Bennetts' traceability argument. Someone must enforce the NPFAA. And that someone would likely be her (under the guidance of AG Labrador). This weighs against her dismissal.

c. Redressability

Finally, and relatedly, Bennetts argues that even if the Court were to enjoin her from prosecuting Plaintiffs, it would not fully redress Plaintiffs' constitutional claims because

the statute could be prosecuted elsewhere and by other people (namely AG Labrador). Dkt. 38-1, at 13–14. Again, this is a somewhat convoluted argument. True, if the Court were to enjoin Bennetts from enforcing the NPFAA, such a result could alleviate Plaintiffs' concerns—but only those Plaintiffs in Ada County where Bennetts has jurisdiction.[4] That result, however, is extremely unlikely. Plaintiffs bring an as-applied challenge and a facial challenge to the NPFAA. Thus, were the Court to find the NPFAA unconstitutional, it would apply to all Defendants. That would, of necessity, redress Plaintiffs alleged injuries. This argument also cuts against removing Bennetts from the case.

### d. Summary

Plaintiffs have not adequately shown an immediate and actual injury caused by Bennetts.[5] As will be discussed below, this conclusion is fatal to the entire case. Critically, however, most of the Court's analysis on the topic stems from the Opinion and statements by Defendants counsel in open Court. Bennetts did not make those arguments herself. So, while somewhat procedurally awkward, the Court will deny Bennetts' Motion itself. But ultimately, she will be dismissed from this case (alongside all Defendants) by function of the Court's finding that there is no present case or controversy.[6]

---

[4] But even this is not entirely true as AG Labrador could still exercise his authority and prosecute persons in Ada County (via special prosecutors or other mechanisms).

[5] That said, as discussed, Bennett's traceability and redressability arguments do not support her dismissal from the case.

[6] The Court is not trying to split a hair too finely or over-complicate the issues. Bennetts makes good arguments related to standing and whether there is an actual injury in this case. And those arguments (in conjunction with other arguments outlined) ultimately prevail in this case. But Bennetts' Motion is also based on theories that do not sit right with the Court (that she is a redundant party, that she isn't responsible for enforcement, etc).

### 2. Failure to State a Claim

Like her traceability argument, Bennetts argues that because Plaintiffs have sued her in her official capacity, their claims fall under 42 U.S.C. § 1983 and, as a result, *Monell* and its attending requirements apply. Dkt. 38-1, at 14–17.[7]

Plaintiffs counter that *Monell* is inapplicable because they have sued Bennetts as an agent of the State of Idaho, not as an agent of Ada County. Again, this muddies the waters. If Plaintiffs wanted to sue an agent of the State of Idaho, they would have sued AG Labrador. And they did. So, the inclusion of Bennetts for that reason is somewhat redundant. Nevertheless, the Idaho Supreme Court has held that county prosecutors carry out their prosecutorial duty to enforce state law as "members of the prosecutorial branch of the State of Idaho and are agents of the State of Idaho." *State v. Baker*, 322 P.3d 291, 295 (Idaho 2014). For that reason, the Court agrees with Plaintiffs that *Monell* is not applicable here and it will not dismiss Bennetts for that reason.[8]

### 3. Conclusion

The Court is persuaded by Plaintiffs' traceability and redressability arguments in the sense that Bennetts, and not just AG Labrador, plays a role in enforcement. But

---

[7] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). *Monell* authorizes Section 1983 suits against a municipality or other local government bodies where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690; *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011).

[8] Bennetts also alleges she should be dismissed from this suit because is it unfair that Ada County taxpayers have to effectively pay double—to fund the State Defendant's defense *and* Ada County's defense. But Ada County did not need to enlist its own counsel. It could have (as Herzog and Thompson did) allowed the Attorney General's Office to defend them *alongside* AG Labrador to conserve resources. The Court does not find this argument persuasive.

Plaintiffs have not established any actual injury. As noted, that overarching principle brings the result Bennetts seeks: dismissal. However, for the reasons outlined, the Court will deny Bennetts' actual motion and simply lump her together with the remaining Defendants as part of the dismissal of the entire case.

## B. Plaintiff's Motion for Preliminary Injunction (Dkt. 2) / Defendants' Motion to Dismiss (Dkt. 43)

Here, the Court is faced with a familiar situation: a motion for preliminary injunction and a competing motion to dismiss. The motions are interwoven. For ease, the Court will structure the decision based upon the preliminary injunction framework but analyze Defendant's dismissal arguments in tandem.

### 1. Success on the Merits

As a reminder, Plaintiffs bring two causes of action. First, they claim the NPFAA is a broad, prospective, viewpoint-based restriction on speech that violates the First Amendment. Second, they claim the NPFAA is unconstitutionally vague under the Fourteenth Amendment. The Court will address each argument in turn.

#### a. First Amendment

The United States Supreme Court has long held that "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.* 205, 391 U.S. 563 (1968)). That principle is at its apex in the context of public universities, where employee speech frequently implicates academic freedom, "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603

(1967).

As a result, while the Supreme Court's "customary employee-speech jurisprudence" does not recognize First Amendment protections for speech made "pursuant to . . . official duties," *Garcetti v. Ceballos*, 547 U.S. 410, 421, 425 (2006), that principle "does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed pursuant to the official duties of a teacher and professor." *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (cleaned up).[9]

This is so because "[t]he classroom is peculiarly the marketplace of ideas," designed to provide "wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian*, 385 U.S. at 603 (cleaned up). The Government cannot single out one perspective, acting as the "thought police" or "force professors to avoid controversial viewpoints[.]" *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021).

Plaintiffs assert they have a high likelihood of success on the merits of their First Amendment claim in this case because the NPFAA prohibits only speech that promotes or counsels in favor of abortion, while permitting speech that denounces or counsels against abortion. They argue such a framework is clearly a viewpoint-based distinction and blatantly unconstitutional. The Court agrees. In fact, Defendants agree.[10]

---

[9] Because "academic scholarship" and "classroom instruction" implicate unique "constitutional interests," *Garcetti*, 547 U.S. at 425, other circuits have likewise held that *Garcetti* does not apply to "core academic functions, such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021). *See also Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 563–64 (4th Cir. 2011); *cf. Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

[10] In the Opinion, AG Labrador states, "[i]f the [NPFAA] were construed to prohibit [speech supporting abortion], the prohibition would likely be unconstitutional." Dkt. 43-3, at 6.

The problem, however, is that Defendants don't think Plaintiffs are interpreting the statute correctly in the first instance. Herein lies their primary objection to Plaintiffs' Motion for Preliminary Injunction and in support of their Motion to Dismiss.

Like Bennetts, Defendants allege Plaintiffs do not have standing because they have not suffered any concrete injury, nor is there any credible threat of prosecution. At best, Defendants say, all Plaintiffs have is a fear of future prosecution and that "fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (cleaned up). And for their part, Defendants assert the speech Plaintiffs wish to make (but claim they cannot under the NPFAA) does not fall under the NPFAA's prohibitions but is actually *allowed*.

Thus, the argument goes like this: because Plaintiffs' speech does not fall under the statue, they will not be prosecuted; because they will not be prosecuted, they do not have standing to sue; and because they do not have standing to sue, they cannot succeed on the merits of their claim.

The Court alluded to the parties' disagreement regarding the terms and parameters of the statue above but will more fully address it now. To do so, it returns to standing.

The contours of standing in a pre-enforcement challenge are fuzzy to say the least. A person need not risk prosecution, but they still must establish some type of injury to establish the "irreducible constitutional minimum of standing." *Lopez*, 630 F.3d at 785 (cleaned up). The Supreme Court has articulated a test that courts can use to determine whether a plaintiff has alleged standing in a pre-enforcement situation. The Ninth Circuit has used that test; but it has also used another test of its own. The Court briefly discusses

MEMORANDUM DECISION AND ORDER – 16

both tests below.

In *Susan B. Anthony List v. Driehaus*, the Supreme Court explained that a Plaintiff in a pre-enforcement suit must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) the intended future conduct must be "arguably . . . proscribed by [the challenged] statute," and (3) the threat of future enforcement must be "substantial." 573 U.S. 149, 159, 164 (2014) (cleaned up).

For its part, the Ninth Circuit has traditionally looked at "whether the plaintiffs have articulated a concrete plan to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139 (cleaned up).

Somewhat unfortunately, the Ninth Circuit has toggled between these two different (but related) tests. *Compare Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022), *with Clark v. City of Seattle*, 899 F.3d 802, 813 (9th Cir. 2018). And to make matters worse, the Circuit has also noted there are unique standing considerations when the pre-enforcement challenge implicates the First Amendment. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.").

Under either test, however, the issues boil down to two questions: first, do Plaintiffs intend to violate the statute? Second, do Defendants intend to prosecute Plaintiffs? Although these two questions are "unusually" related in this case, the Court will address each in turn. *See Peace Ranch, LLC v. Bonta,* 93 F.4th 482, 489 (9th Cir. 2024) (noting

that pre-enforcement challenges always seem to have "unusual" facts or procedural circumstances).

### i. Plaintiffs' Intent to Violate the Statute

Plaintiffs contend they plan to violate the statute because some of the speech they need (and/or want) to engage in would likely be viewed as supporting abortion. Defendants, however, counter that Plaintiffs planned activities do not violate the NPFAA in the first instance because the plain language of the statute does not encompass academic teaching or scholarship.

Defendants explain that the terms Plaintiffs are most concerned about—"promot[ing]" and "counsel[ing] in favor of"—abortion are not as restrictive as Plaintiffs want the Court to believe. Defendants point to the Opinion and represent that this document—authored by the entity charged with enforcing the NPFAA—should give Plaintiffs all the reassurance they need that their speech is acceptable and does not fall within the four corners of the NPFAA.

The NPFAA does not define the terms "promote" or "counsel in favor of." The parties' definitions, however, are similar. Defendants proffer that the word "counsel" means "advice, esp. that given formally." Dkt. 43-1, at 19.[11] Defendants then explain that a professor who directly counsels or advises a student privately (e.g., during office hours) to obtain an abortion would likely violate the statue. But Defendants counter that same professor would be fine if he or she were simply discussing arguments in favor of abortion

---

[11] Plaintiffs also say that "counsel" means "to advise." Dkt. 2-1, at 21.

MEMORANDUM DECISION AND ORDER – 18

in the classroom setting.

Defendants explain the term "promote" means to "further the progress" of something but that it is largely "similar to the meaning of counsel." Dkt. 43-1, at 20.[12] Again, Defendants contend a professor who discusses abortion—even favorably—would be fine. The prohibition here is on "specific efforts to facilitate specific abortions." Dkt. 43-1, at 21.

In support, Defendants refer to the Opinion and AG Labrador's explanation that the specific conduct Plaintiffs seek to engage in does not fall within the NPFAA and will not, therefore, be prosecuted. Defense counsel reiterated as much numerous times at oral argument. *See, e.g.,* Dkt. 61, at 40–41 (explaining that they do not think the "Act even applies to plaintiffs' pleaded conduct that is at issue in this case, which is academic speech in the context of academic scholarship and teaching"); 42 ("[T]his Act does not apply to plaintiffs' pleaded conduct."); 45 (the act "does not apply to academic speech in the context of academic scholarship and teaching").

The Court has lingering concerns.

Defendants allege "counsel" and "promote" have "well-understood meanings" that give "clear notice of what is prohibited[.]" Dkt. 43-1, at 22. But, as noted above, the Opinion is almost 10 pages long. If the statute was clear and well-understood as to what was covered and what was not, it took Defendants an awfully long time to say as much.[13]

---

[12] Plaintiffs' definition of "promote" is "to further the growth, development, progress, or establishment of" something. Dkt. 2-1, at 20–21.

[13] More to the point: if the statute was clear in its application to academia, why did a legislator need to ask for clarification?

What's more, experienced lawyers at various universities' Offices of General Counsel had a difficult time parsing the language of the NPFAA, advising professors on how to apply the law in the classroom, and whether any particular speech or conduct might constitute a violation. And lawyers in the present case have spent a large amount of ink trying to decide just how far the statue reaches.

Thus, the fact remains: the *statute itself* is silent regarding whether any specific group (such as professors) or any sub-type of speech (such as academia) is exempt from its reach.[14] Thus, while the words themselves *may* be fairly understood,[15] their application in the academic setting is less than clear. Thus, reasonable minds could differ when it comes to answering the question of whether Plaintiffs plan to violate the statue because reasonable minds could differ on the scope of the statute vis-à-vis certain definitions.

### ii. Defendants' Intent to Prosecute Plaintiffs

While the above question is left open to interpretation, the second question is not. Defendants have repeatedly stated—in the Opinion, in briefing, and at oral argument—that they will not prosecute *these* Plaintiffs for the *claimed* conduct. The Court will discuss each "disavowal" below.

### 1. The Opinion

Although discussed extensively already, the Court has not quoted directly from the Opinion itself. Again, this document is over ten pages long and the Court has no intent of

---

[14] Notably, during the 2023 legislative session, members of the Idaho Legislature proposed an amendment to the NPFAA that would have specifically exempted "classroom discussion on the subject of abortion at a school, college, or university," but it was never enacted. Dkt. 1, at 16–17.

[15] It goes without saying that what one person may consider as "promoting" abortion could differ from another person's interpretation. This vagueness concern will be discussed more fully below.

MEMORANDUM DECISION AND ORDER – 20

reviewing all of the analysis therein. But for purposes of the present discussion the Court notes that the Opinion explicitly states that AG Labrador has "conclude[d] that the plain meaning of the [NPFAA] does not prohibit employees of institutions of higher education from engaging in abortion related speech as part of their academic teaching or scholarship, even if that teaching of scholarship could be viewed as supporting abortion." Dkt. 43-3, at 10. AG Labrador goes on to state that his "office would not bring any . . . prosecution under the Act inconsistent with the interpretation set forth" in the Opinion. *Id*.

The Court begins with its concerns.

First, the Opinion is not binding in this litigation. *See Holly Care Ctr. v. State, Dep't of Emp.*, 714 P.2d 45, 51 (Idaho 1986) (noting that opinions from the attorney general are entitled to deference but are not binding on the courts). As a result, there is nothing that "prevents the State from changing its mind" about the Opinion's interpretation at any time. *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000). This is worrisome to Plaintiffs. And the Court.

Second, the Opinion has its own carve-outs. It specifically states that it "does not relate to speech by employees of public higher education institutions that is not related to teaching or scholarship, or to teaching or scholarship that is not speech or expressive conduct." Dkt. 43-3, at 9.[16]

That said, Defendants readily admit in the Opinion that, if the statute were to curtail Plaintiffs' favorable speech about abortion it *"would likely be unconstitutional*." *Id.* at 6

---

[16] The Opinion also states that it does not "apply to teachers at public primary and secondary schools since the same academic freedom analysis may not apply to primary and secondary school teachers." *Id.*

(emphasis added). To a large degree then, it appears Defendants—the party responsible for enforcing the statute—are acquiescing to Plaintiffs' argument. This, however, begs the question of why the parties were not able to resolve this suit prior to the present motions and why Defendants are opposed to a declaratory judgment memorializing what both parties seem to recognize and agree upon.

The Court is not, of course, privy to settlement discussions, but Defendants noted at oral argument that their analysis in this case was *specific* to this case. That is to say, it only addressed the contours of Plaintiffs allegations here, not other hypotheticals. This is a very important point for reasons which will become apparent when the Court discusses how it could fashion a remedy in this case. It was for this reason that Defendants also would not agree to a declaratory judgment: because the Court does not have jurisdiction over these Plaintiffs—owing to their lack of standing—it cannot issue a declaratory judgment as related to these (or other hypothetical) plaintiffs. Both of these points are well taken.

Again, the Court is not entirely convinced that AG Labrador's reading and interpretation of the NPFAA is the same as its own reading and interpretation of the NPFAA. But AG Labrador, not the Court, is responsible for the enforcement of the NPFAA and, as noted, his interpretation is "entitled to consideration." *Ehco Ranch, Inc. v. State ex rel. Evans*, 693 P.2d 454, 457 (Idaho 1984). *See also Lopez*, 630 F.3d at 788 (reaffirming plaintiffs cannot "demonstrate the necessary injury in fact where the enforcing authority [has] expressly interpreted the challenged law as not applying to the plaintiffs' activities.")

The Opinion makes clear that AG Labrador *does not* view Plaintiffs' complained-of speech as problematic under the NPFAA and also, that he *will not* prosecute such speech.

This is a persuasive indication of disavowal.

### 2. Briefing

Again, framing Defendants' arguments is important. They are not arguing simply that they will not prosecute these Plaintiffs for these actions because of their prosecutorial discretion, but rather, because of their interpretation that the purported actions do not fall within the statute to begin with. In other words, in Defendants estimation, Plaintiffs are quite literally worrying for no reason. In briefing, Defendants explain and expound upon the Opinion and reiterate that Plaintiffs challenged conduct does not fall within the meaning of the NPFAA (Dkt. 43-1, at 18, 21) and that they will not prosecute Plaintiffs for this conduct (*Id*. at 21).

Related to briefing: after the initial round of briefing concluded—but before oral argument—Defendants submitted a notice of supplemental authority. Dkt. 58. In that notice, Defendants brought to the Court's attention a recently-issued decision from the Ninth Circuit—*Peace Ranch, LLC v. Bonta*, 93 F.4th 482 (9th Cir. 2024) ("*Peace Ranch*")—and its implications in this case. Insofar as that matter was not fully briefed, but rather argued at oral argument, the Court will discuss it next.

But Defendants' comments in briefing are also persuasive in the Court's finding that they have disavowed enforcement of this kind of speech.

### 3. Oral Argument

Consistent with the Opinion and their briefing, Defendants at oral argument specifically noted they did not view Plaintiff's conduct as falling within the confines of the NPFAA and that they do not intend to prosecute them for said conduct. *See* Dkt. 61, at 38,

MEMORANDUM DECISION AND ORDER – 23

40–41, 42–43, 44, 45, 51.

Defendants also discussed *Peace Ranch* at length. That case bears mentioning here.

*Peace Ranch* was a case concerning a rent control challenge in California—a subject far different from the current challenge. 93 F.4th at 484. Importantly, however, the Ninth Circuit discussed therein the impact of disavowal on a pre-enforcement challenge. *Id*. at 489–90. In that case, the California Attorney General *refused* to disavow enforcement of the challenged provision against those Plaintiffs. *Id*. at 490. When asked directly at oral argument whether she would commit to not enforcing the law against Peace Ranch, she replied "No." *Id*. The Ninth Circuit found it could not ignore that admission. *Id*. While the Circuit noted that courts "cannot go so far as to say that a plaintiff has standing whenever the Government refuses to rule out use of the challenged provision," the failure to disavow "is an attitudinal factor the net effect of which would seem to impart some substance to the fears of [plaintiffs]." *Id*. (citing *LSO*, 205 F.3d at 1154–56 (cleaned up)). *See also California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) ("Here, the state's refusal to disavow enforcement . . . is strong evidence that the state intends to enforce the law and that [the plaintiffs] face a credible threat.").

Defendants argue that analysis applies equally here even though the situation is reversed. If the refusal to disavow lends credence to the idea that Plaintiffs have suffered an injury, then affirmative disavowal must necessarily reflect a lack of potential injury. The Court agrees. Defendants' numerous statements at oral argument strongly support its disavowal argument.

*2. Conclusion*

As the Ninth Circuit has recognized, a "plaintiffs' claims of future harm lack credibility when the challenged speech restriction by its terms is not applicable to the plaintiffs, or the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs." *Lopez*, 630 F.3d, at 788. Both of those criteria are present in this case.

Defendants have shared their interpretation of the NPFAA and made clear it does not include the claimed actions of Plaintiffs. But more importantly, Defendants have committed not to prosecute Plaintiffs for their actions. And this commitment was not vague or in passing. Defendants stated their position in an official Opinion from AG Labrador, in briefing before this Court, and at oral argument.

The Court finds these statements and documents sufficient to serve as a disavowal of prosecution. Because of this disavowal, the Court cannot find Plaintiffs have a substantial fear of harm under *Driehaus*. Under *Thomas*, it likewise cannot find that the Defendants have communicated any warning or threat of prosecution. And there is no history of enforcement either.

For all these reasons, the Court finds Plaintiffs have not articulated a sufficient injury and lack Article III standing[17] for their First Amendment Claim as a pre-enforcement

---

[17] In the context of a constitutional challenge, the "merits" on which a plaintiff must show a likelihood of success "encompass[es] not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015). Simply put, "a party who fails to show a substantial likelihood of standing is not entitled to a preliminary injunction." *R. K. by & through J. K. v. Lee*, 53 F.4th 995, 998 (6th Cir. 2022) (cleaned up). This stands to reason because an "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring in part) (emphasis in original).

challenge.[18] This claim must be dismissed.

### C. Fourteenth Amendment

Plaintiffs' second cause of action alleges the NPFAA is unconstitutionally vague.

A law is impermissibly vague if it either "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012); *see also Butcher v. Knudsen*, 38 F.4th 1163, 1165 (9th Cir. 2022) ("[P]rotections against impermissibly vague laws . . . are at their maximum" in the First Amendment context.).

In the education context in particular, the "chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." *Keyishian*, 385 U.S. at 604. Furthermore, where a law carries criminal, rather than civil, penalties, the test for vagueness is even more demanding because the "severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. ACLU*, 521 U.S. 844, 872 (1997).

The Court understands Plaintiffs' concerns in this case. The words at issue here— "promote" and "counsel"—are difficult to interpret in practice. What one person may

---

[18] Because Plaintiffs have failed to establish an injury-in-fact, the Court need not discuss the remaining standing elements.

consider as "promoting" or "counseling in favor of" abortion, another may consider neutral. *See supra* note 15. The subjective nature of the words makes it difficult to clearly delineate between acceptable and prohibited conduct. But again, the body responsible for enforcing the statute has told Plaintiffs how *they* will interpret these words and they have been clear that the definition does not include the conduct they seek to protect in this suit. *Lopez*, 630 F.3d, at 788. Thus, there is no chilling effect on Plaintiffs' free speech regarding abortion in the academic context. For this reason, the Court similarly finds Plaintiffs have not met the standing requirements and cannot show a likelihood of success on the merits of their Fourteenth Amendment claim. This claim too must be dismissed.

The Court need not analyze the remaining *Winter* factors in light of its finding that Plaintiffs have failed to satisfy the first *Winter* factor—a likelihood of success on the merits of either of their claims. *See, e.g., Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1244 (9th Cir. 2015) ("Because the district court acted within its discretion in reaching that conclusion [of no likelihood of success on the merits], we need not consider the remaining preliminary injunction factors."); *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1058 (9th Cir. 2013) (affirming district court's denial of a preliminary injunction based only on review of the lack of a likelihood of success on the merits).

## VI. CONCLUSION

The Court wishes to discuss one final matter to help tie its discussion (and decision) together today.

The United States Supreme Court recently provided guidance regarding the breadth of preliminary injunctions. *See generally Labrador v. Poe*, 144 S. Ct. 921 (2024). There,

the Supreme Court advised that lower courts should tailor any emergency action to the parties who brought the suit and to the specifics of the challenged law. *See Poe*, 144 S. Ct. at 923.

The Court has recently had occasion to put this guidance to work and has issued narrowly-tailored preliminary injunctions. *See, e.g., Sierra Club v. City of Boise,* 2024 WL 2932994, at *6 (D. Idaho Apr. 29, 2024) (issuing partial injunction in favor of single Plaintiff entity)*; BlueRibbon Coalition v. Garland,* 2024 WL 3067279, at *11 (D. Idaho June 20, 2024) (issuing narrowly-tailored injunction only as to the plaintiff).

In this case, Plaintiffs bring a facial and an as-applied challenge[19] to the NPFAA. Specifically, Plaintiffs ask the Court to declare that the NPFAA violates the First and Fourteenth Amendments and to issue a preliminary and permanent injunction to stop Defendants from enforcing the NPFAA: (1) "with respect to speech 'promot[ing]' and 'counsel[ing] in favor of' abortion," and (2) "with respect to academic speech . . . of Professor Plaintiffs . . . and similarly situated individuals at Idaho's public universities." Dkt. 1, at 39–40. Thus, complicating the fact that there is not a clear demarcation between facial and as-applied challenges, Plaintiffs appear to have some overlap in their causes of

---

[19] "Facial and as-applied challenges do not enjoy a neat demarcation, but conventional wisdom defines facial challenges as 'ones seeking to have a statute declared unconstitutional in all possible applications,' while as-applied challenges are 'treated as the residual, although ostensibly preferred and larger, category.'" *Standing--Facial Versus As-Applied Challenges--City of Los Angeles v. Patel*, 129 Harv. L. Rev. 241, 246 (2015) (quoting Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 Cal. L. Rev. 915, 923 (2011)). However, as many scholars note, the distinction, if any, between a facial and an as-applied challenge is difficult to explain because there is a disconnect between what the Supreme Court has outlined and what happens in actual practice. *Id.; see also* Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 882 (2005). Ultimately, however, it is not so much the label that matters, but the "breadth of the remedy employed by the Court[.]" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

action vis-à-vis the various plaintiffs.

Critically, however, there are numerous provisions within the NPFAA that Plaintiffs do not challenge at all (e.g. providing facilities for abortions). There are also other applications of the provisions they *do* challenge that can be constitutionally applied (e.g. regarding "promoting" abortion in non-academic settings).

Thus, even assuming arguendo the Court found Plaintiffs had standing and could show a likelihood of success on their claims, it would issue a narrow injunction that would apply just to them and just to the provisions of the NPFAA they feel infringe on their rights. But the problem is that Defendants have already said they will not enforce those provisions of the NPFAA Plaintiffs feel infringe on their rights as applied to them. In other words, any preliminary injunction in this case would be of no consequence as the behavior the Court would enjoin Defendants from taking will not occur in the first instance.

In short, the Court finds that Plaintiffs cannot succeed on either of their claims because they lack standing. As the Supreme Court very recently held:

> To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them. To carry that burden, the plaintiffs must proffer evidence that the defendants' allegedly wrongful behavior would likely occur or continue.

*Murthy v. Missouri*, 2024 WL 3165801, at *13 (U.S. June 26, 2024) (cleaned up).

Here, Plaintiffs cannot show any threat of harm or any planned prosecution by Defendants. There is not, therefore, any "wrongful behavior" that would "likely occur or continue." *Id*. This is primarily because Defendants have affirmatively disavowed enforcement as to *these Plaintiffs under the specific parameters of this case.* Such is

sufficient for the Court to find Plaintiffs lack standing and there is no justiciable issue at play. It must decline jurisdiction and dismiss the case.

## VII. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. Plaintiffs' Motion for Preliminary Injunction (Dkt. 2) is DENIED.

2. Defendant Bennetts' Motion to Dismiss (Dkt. 38) is DENIED.

3. AG Labrador's Motion to Dismiss (Dkt. 43) is GRANTED.

4. This case is DISMISSED and CLOSED.

5. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: July 2, 2024

David C. Nye
Chief U.S. District Court Judge